## THE HARRIMAN.

Performance of a contract of charter-party to proceed to a distant port speci- fied, made during a war and for the obvious purpose of furnishing ar- ticles to one of the parties to it, held not dispensed with by the fact, learned in the course of the voyage, that the whole purpose of the voy- age was defeated by the changed condition of military operations; the language of the charter-party having been absolute in its terms, and without provision for any contingency.

APPEAL from the. Circuit Court for the District of Cali- fornia, the case being thus:

During the recent war between Spain and the Republics of Chili and Peru, the Spanish fleet being engaged in active hostilities in the South American waters against the ports of the enemy, required supplies of steam-coal, and vessels were taken up on charter, in San Francisco, to convey car- goes for delivery at sea to the vessels of the fleet in aid of the hostile operations of blockade and bombardment of the Chilian ports.

Among these vessels taken up by persons watching the operations of the Spanish fleet, was the ship B. L. Harriman, which was engaged in this service by a charter-party, under date of May 4th, 1866, entered into between one C. J. Jan- sen, her owner, a merchant of San Francisco, and a certain Emeric, as freighter, also a merchant of that city.

The ship engaged her whole capacity to the freighter, and to take no cargo except from him or his agent, he stipulat-

ing to furnish a cargo of 786 tons of steam-coal (already laden on board) and to pay "for the use of said vessel during the voyage aforesaid, $15 per ton, one-half to be paid here to C. J. Jansen, of San Francisco, two days after the sailing of the vessel, and the other half to C. J. Jansen, of San Francisco, on receipt of cancelled bill of lading that the coal has been delivered."

The owner stipulated for the freighting and chartering of the vessel "for a voyage from San Francisco to Cobija, Bolivia, or other ports in the Pacific; *the port of discharge to be named before the vessel sails from San Francisco;* such instructions to be given by letter in triplicate, which will contain the privilege which is hereby given, that if the vessel pro- ceeds direct by the instructions given to Valparaiso, *the com- manding officer of the Spanish navy will have the right to receive only a part of the cargo, the whole, or none, and to send her, if he desires, to another port in Chili, Peru, or the Chincha Islands,* and in that case, the vessel will immediately proceed to the *port which will be named by said commanding officer,* and there complete her discharge."

The letter of instructions provided for in the charter-party was given by the freighter to the master of the ship, under date of May 14th, 1866, and says:

"I hereby name you the port of *Valparaiso,* Chili, as the first port you have to proceed to on leaving San Francisco, and when there, *to report yourself to the commanding officer of the Spanish navy,* who will have the right, &c." (pursuing the privilege con- tained in the charter-party).

The instructions proceed:

"I herewith hand you a letter for *the commanding officer of the Spanish navy,* at Valparaiso, *which contains the bill of lading of your entire cargo of coal, indorsed to his order, a duplicate of this charter-party, and of this letter."*

On May 17th, 1866, before the ship sailed, the freighter addressed another letter of instructions to the master, con-

taining a copy of some instructions which he had himself received from Panama, and requesting the master to follow them so far as he could.   They were thus:

" On receipt of this letter, if you have not attended to all our outstanding orders, you are requested to suspend operations until further ordered, including even the last one thousand tons of coal, for it is more than possible that the naval forces down there will have changed their base of operations.   In case, however, you should have taken up a vessel before the present reaches you, then you must instruct the ship *to seek after the fleet between the port of Valparaiso and the Chinchas.*"

On the 19th of May, the freighter gave to the master the liberty to call at the *Chincha Islands,* if wind and weather or other circumstances favored his making them *without prejudicing the freighter's rights under the charter-party and instructions.   These islands are about* 1200 *miles north of Valparaiso,* to which place, it will be remembered, that by the principal letter of instructions the freighter had directed the master to go.

*After the ship sailed,* the owner wrote a letter to the freighter, in which he says:

" In your charter of the ship B. L. Harriman there is no provision made for the possibility of there being nobody to receive her (the ship's cargo) on arrival, nor do I know that the captain of the Harriman had your private instructions on this point. At the time of making the charter we could hardly contemplate anything of the kind, hence the omission, and wish you will make some provision in the event such should be the case, and instruct me how to act, that I may communicate same to Captain Swenson."

During the period of this transaction, war existed between Spain and Chili.   The cargo was intended for the admiral of the Spanish fleet, then supposed to be operating against Valparaiso.   The ship sailed from San Francisco, May 22d, and *on May* 24*th the fleet left the coast of Chili, and went to parts unknown, and did not return there.*   The ship arrived at the Chin-

chas August 3d, 1866, and was there informed of the bombardment of Callao by the Spanish fleet, May 2d, that the fleet had been badly shattered and had sailed away; that a regular mail steamer from Valparaiso reported at the Chinchas that all was quiet at Valparaiso, and that nothing was known of the fleet. The master also proved that the coal would have been seized at the Chinchas if he had betrayed the objects of the voyage, as the feeling was very bitter, and that he believed the coal would have been instantly seized at Valparaiso.

The ship returned to San Francisco without having ever gone past the Chincha Islands. Being now in San Francisco, the owner offered to deliver the cargo there to the freighter, on payment of freight according to the charter-party. Payment of freight was refused by the freighter, and the cargo was demanded by him, which was refused except on payment of freight. The owner sold the cargo, and the freighter libelled the ship for the value of the cargo, and to recover back the amount paid under the charter-party, at the outset of the voyage, as so much freight paid in advance. The owner justified the sale under his lien for freight, claiming the unpaid charter-money, and a return freight at the same rate for the home voyage.

The District Court sustained the owner's right and lien for the unpaid charter-money, but rejected the claim for freight on the return voyage, and, as a result, gave a decree against the vessel for the balance of the proceeds in the owner's hands from the sale of the cargo, after satisfying the lien as allowed.

The Circuit Court rejected the right and lien of the owner to the charter-freight, and gave a decree for the proceeds of the cargo sold, and the charter-money paid at the outset of the voyage.

The claimant appealed to this court.

*Mr. Evarts, for the appellant:*

The real freighter, acting through the agency of the libellant, a San Francisco merchant, was obviously the admiral

of the Spanish fleet, and to him the cargo was consigned, the bill of lading indorsed, and to him the ship was required to report, and his instructions the master was required to obey. The whole object of the voyage and the whole motive of the affreightment, were the supply of coal to the Spanish fleet, for use therein, in aid and support of its hostile operations against the Chilian seaports. This service of the ship not only made the *cargo*, by its destination, contraband of war and lawful prize to the Spaniard's enemy, but exposed the *ship itself*, thus made a guilty tender of the Spanish maritime hostilities, to lawful capture and condemnation. These considerations determine the *destination* of the voyage as *the Spanish fleet off the coast of Chili*, and limit the purpose and the significance of any reference to Valparaiso, the Chinchas, or the other geographical or commercial points, to an ascertainment of the *situs* of the fleet, within the reciprocal engagements of the charter-party. The ports or commerce of the Spaniard's enemy were not only wholly foreign to the purpose and the terms of the projected voyage, but the nature of the enterprise and the interests of owner and freighter alike, excluded such ports and commerce as an alternative resort, or even a possible refuge, unless from otherwise inevitable shipwreck. By the very necessity of the reciprocal engagements, therefore, upon which the project of the voyage rested, the *situs* of the Spanish fleet, as the terminus of the voyage, and the presence of the consignee, the admiral, to receive the deposit of the cargo and liberate the ship from its transported burden, was within the obligations of the *freighter*, and clear of any responsibility or venture of the *owner*. The charter-party, the contemporaneous instructions, and the last advices from the Spanish fleet, communicated to the master by the freighter, admit of but one interpretation. The Spanish fleet was to receive the cargo at Valparaiso, and the admiral, within certain limits, was to direct its deposit or distribution. By the advices communicated by the letter of the freighter to the master, under date of May 17th, an *indulgence* rather than a right was suggested, that, contingently, the presence of the Spanish fleet between

Valparaiso and the Chincha Islands should be a ·sufficient compliance with its obligations in respect of the *geographical* terminus of the voyage.

The ship sailed upon and completed the voyage, bringing itself within the waters contemplated as the *situs* of the Spanish fleet for the reception of the cargo. She held the cargo merely for delivery, and nothing but the absence of the stipulated depositary and consignee prevented the delivery. Within two days after the ship sailed from San Francisco (May 24th), the Spanish fleet voluntarily withdrew from the South American waters, and never returned. Thus, by this voluntary act of the freighter's principal and stipulated consignee, the delivery of the cargo was prevented, its deposit rendered impossible, and the ship's master made the freighter's agent, by necessity, for the preservation of the cargo. The master of the ship, observing all the obligations of his new and compulsory duty, by prudent counsels and prompt action, extricated the cargo from the destruction to which the consignee had abandoned it, and the ship itself from the peril to which the consignee's desertion of his obligations had exposed it.

The decree of the Circuit Court should be, therefore, reversed, and the decree of the District Court either affirmed or modified, according as the judgment of this court shall be on the question of *the earning of freight on the return voyage.*

*Mr. B. R. Curtis, contra,* contended that whatever expectations the parties might have had, the contract was an absolute contract to proceed to Valparaiso, unless otherwise directed by the Spanish admiral while on the voyage to that port; that the meaning of the contract was not to be influenced by the result of the war in Chili; that the parties not having had an *ex post facto* experience, the contract was not to be interpreted by *ex post facto* discoveries; that the contract had not been performed, inasmuch as the ship proceeded but to the Chinchas, twelve hundred miles short of the proper port, and then, not having found the Spanish fleet, immediately broke up the voyage and began her return voyage

to San Francisco; that the charterer had in no manner waived performance, nor prevented it by any fault of omission or commission; that as a necessary deduction from the foregoing premises no freight had been earned, and that the owner, Jansen, must account for the full value of the cargo, and refund the half freight paid in advance.*

The learned counsel further argued, that it was a proposition too clear for denial, and one which had been lately strongly applied in this court,† that where a party undertakes positively to perform a certain act for a certain stipulated compensation, he cannot claim the compensation, however difficult or impossible performance may be, so long as the act remains unperformed, unless, indeed, the non-performance is owing to the fault or omission of the other contracting party; that when a ship was chartered for a port known to be blockaded, or for a port which was subsequently put under blockade, the risk or impossibility of entry could never be urged on behalf of the ship as entitling her to freight, as if the voyage had been performed, and that the same rule was applied against charterers.‡

Mr. Justice SWAYNE stated the case, and delivered the opinion of the court.

This is an appeal in admiralty from the decree of the Circuit Court of the United States for the District of California.

The charter-party, which lies at the foundation of the controversy, bears date on the 4th of May, 1866. The parties to it were Jansen, the claimant, and owner of the ship, and Emerick, the freighter. Both parties were merchants of San Francisco. The entire capacity of the ship was engaged to the freighter. He stipulated to furnish her a cargo of

---

* Portland Bank *v.* Stubbs, 6 Massachusetts, 426; Benner *v.* Equitable Co., 6 Allen, 222; Chase *v.* Alliance Co., 9 Id. 311.

† Dermot *v.* Jones, 2 Wallace, 1.

‡ Scott *v.* Libby, 2 Johnson, 340; Burrill *v.* Cleeman, 17 Id. 72; Bright *v.* Page, 3 Bosanquet & Puller, 296, note; Barber *v.* Hodgson, 3 Maule & Selwyn, 267; Hadley *v.* Clarke, 8 Term, 265; Atkinson *v.* Ritchie, 10 East 530; Vlierbloom *v.* Chapman, 13 Meeson & Welsby, 230.

786 tons of steam-coal, and to pay "for the use of said ves-
sel during the voyage aforesaid, $15 per ton in United States
gold coin, one-half to be paid here to C. J. Jansen, of San
Francisco, two days after the sailing of the vessel, less two
and one-half per cent. discount for cash, and the other half
to C. J. Jansen, of San Francisco, on receipt of cancelled bill
of lading that the coal has been delivered." The owner
stipulated. "for a voyage from San Francisco to Cobija, Bo-
livia, or other ports in the Pacific; the port of discharge to
be named before the vessel sails from San Francisco; such
instructions to be given by letter in triplicate, which will
contain the privilege which is hereby given, that if the ves-
sel proceeds direct by the instructions given to Valparaiso,
*the commanding officer of the Spanish navy will have the right to
receive only a part of the cargo, the whole, or none, and to send
her, if he desires, to another port in Chili, Peru, or the Chincha
Islands,* and in that case, the vessel will immediately proceed
to the *port which will be named by said commanding officer*, and
there complete her discharge." In pursuance of the condi-
tion of the charter-party Emerick, on the 14th of May, 1866,
addressed a letter to Swenson, the master, in which he said:
"I hereby name you the port of Valparaiso, Chili, as the first
port which you have to proceed to on leaving San Francisco,
and when there to report yourself to the commanding officer
of the Spanish navy, who will have the right to take only a
part of your cargo of coal, the entire cargo, or none, and
if he desires, to send you to another port in Chili, Peru, or
the Chincha Islands, in which case you will have to proceed
immediately to the port named by said commanding officer,
and there complete your discharge, these conditions and
privileges being part of the charter-party. I herewith hand
you a letter for the commanding officer of the Spanish navy
at Valparaiso, which contains the bill of lading of your en-
tire cargo of coal, indorsed to his order." On the 17th of
May, Emerick addressed another letter to the master, in
which he gave a copy of the instructions he had received
from Panama, which were as follows: "On receipt of this
letter, if you have not attended to all our outstanding orders,

you are requested to suspend operations until further ordered, including even the last one thousand tons of coal, for it is more than possible that the naval forces down there will have changed their base of operation.    In case, however, you should have taken up a vessel before the present reaches you, then you must instruct the ship to seek after the fleet between the port of Valparaiso and the Chinchas."    He added : " As far as it is in your power you are requested by me to follow the above instructions."    On the 19th day of May, Emerick gave the master permission to make the Chincha Islands, if circumstances should be favorable, without, however, prejudicing his " rights under the charter-party, and instructions."

On the 22d of May, the vessel left San Francisco for the port of Valparaiso.    She was freighted according to the charter-party.    On the 16th of June following, Jansen said to Emerick, by letter of that date, " In your charter of the ship B. L. Harriman, there is no provision made for the possibility of there being nobody to receive her (the ship's cargo) on arrival, nor do I know that the captain of the Harriman had your private instructions on this point.    At the time of making the charter we could hardly contemplate anything of the kind, hence the omission, and wish you will make some provision in the event such should be the case, and instruct me how to act, that I may communicate same to Captain Swenson."

Emerick made no reply.    The ship proceeded to the Chincha Islands, and returned thence to San Francisco.    Captain Swenson, in his protest, says that on the 4th of August he took a pilot on board and ran in near to the southernmost of those islands, and " lay in close to the land."    He went ashore, and learned that the Spanish fleet had hauled off from the Chilian coast, and gone upon an unknown destination.    After diligent inquiry, he became satisfied that any attempt to find the fleet would be " impracticable and fruitless."    He became satisfied also that it was necessary to return at once to San Francisco, and took his departure the same day on his return voyage.    He considered his original

voyage broken up by the withdrawal of the Spanish fleet, and the absence from Valparaiso of its commander, the consignee of his cargo. Upon the return of the vessel Emerick refused to pay the balance of the freight-money. Jansen thereupon landed and sold the cargo. Emerick filed this libel, seeking thereby to recover back the freight-money he had paid and the value of the cargo. The owner proved that at the time the charter-party was entered into war existed between Spain and Chili; that the cargo was intended for the admiral of the Spanish fleet, then supposed to be operating against Valparaiso; that on the 24th of May the Spanish fleet left the coast of Chili and went to parts unknown, and did not return there. He proved by the master the facts stated in his protest, and further, that he was informed at the Chincha Islands of the bombardment of Callao by the Spanish fleet; that the fleet had been badly shattered, and had sailed away. The master feared his coal would be seized at the Chincha Islands, if he betrayed the object of his voyage. The feeling there was very bitter. He believed the coal would have been instantly seized at Valparaiso.

Thus the case stood upon the proofs. The District Court decreed for the owner. The Circuit Court decreed against him, and he has brought the case to this court for review.

In settling the rights of the parties, the inquiries which demand our attention are: What was the contract between them? Was it fulfilled by the ship? and if not, was the nonfulfilment excused by fault or waiver on the part of the charterer, or by other facts, disclosed in the proofs, so as to entitle the owner to all, or any part of, the freight-money stipulated for in the charter-party?

According to that instrument, the destination of the vessel was to be fixed by letter before her departure upon her voyage. If it were Valparaiso, the commanding officer there of the Spanish fleet was to be the consignee, with the right to direct the ship to proceed further, and deliver all or a part of her cargo elsewhere. By the charterer's letter of the 14th

of May, Valparaiso was designated as the port to which she was first to proceed.

This destination was not subsequently changed, either in fact or according to the understanding of the parties. Emerick's letter to the master, of the 17th of June, requested him to search for the Spanish fleet between Valparaiso and the Chincha Islands, but it gave no intimation of a purpose or willingness that he should abandon the voyage to Valparaiso, as originally prescribed, and certainly no authority to that effect.

The charterer's letter of the 19th of May, authorizing the master to make the Chincha Islands, expressly reserved his rights "under the charter-party and instructions."

Jansen's letter of the 16th of June admits that the vessel had sailed for Valparaiso, and asks instructions as to the disposition of the cargo if the Spanish commander should have left there before her arrival. The master states in his protest that his destination, upon leaving San Francisco, was Valparaiso. He went no further than the Chincha Islands, which were short of that point about twelve hundred miles. He made no search for the fleet between the two points, and gave no reason for breaking up the voyage and not proceeding to the port of delivery, but the probable absence of the consignee and the peril there to ship and cargo.

The existence of the war was known to both parties when the contract was entered into. The owner made no provision against any contingency. His engagement was simple, direct, and unconditional, that the vessel should proceed to Valparaiso. The presence or absence of the consignee was immaterial. If absent it was the right and duty of the master to place the cargo in store.* The contract was not fulfilled. For this the shipper is in nowise responsible. Such are the relations of the parties.

The contract of affreightment is governed by the same principles as other special contracts. There are none to which these principles are more stringently applied. The

---

* Fisk v. Newton, 1 Denio, 45.

contract is an entirety; and where there has been no complete fulfilment on one side, and no fault or waiver on the other, no freight-money can be recovered.  Mr. Justice Story says this is the result of all the cases.*

In *Paradine* v. *Jane*,† the court said: "When the party by his own contract creates a duty or charge upon himself he is bound to make it good if he may, notwithstanding any accident by inevitable necessity, because he might have guarded against it by his contract." Such has always been the rule of the common law.  If a lessee covenant to repair, and the house is burned down, he is bound to rebuild.  If a party covenant to build a bridge and keep it in repair for a specified time, and it be swept away by an extraordinary flood before the time expires, he must replace it.  A party agreed to secure in England for another the exclusive right to make, use, and vend in the Canadas a machine covered by a patent from the United States.  It was found that this could only be done by an act of the British Parliament.  As such a grant, however improbable, was not impossible, it was held that the case was within the rule laid down in *Paradine* v. *Jane*, and that the covenantor was liable for the breach of his agreement.‡  If a condition be to do a thing which is impossible, as to go from London to Rome in three hours, it is void; but if it be to do a thing which is only improbable or absurd, or that a thing shall happen which is beyond the reach of human power, as that it will rain to-morrow, the contract will be upheld and enforced.§

The principle deducible from the authorities is, that if what is agreed to be done is possible and lawful, it must be done.‖  Difficulty or improbability of accomplishing the undertaking will not avail the defendant.  It must be shown that the thing cannot by any means be effected.  Nothing short of this will excuse non-performance.¶  The answer to

---

\* The Nathaniel Hooper, 3 Sumner, 555.          † Alleyn, 26.

‡ Beebe *v.* Johnson, 19 Wendell, 500.

§ Comyn's Digest, 96 , Rolle, 420, l. 20.

‖ Touteng et al. *v.* Hubbard, 3 Bosanquet & Puller, 300.

¶ 2 Parsons on Contracts, 672; Beebe *v.* Johnson, 19 Wendell, 500.

the objection of hardship in all such cases is that it might have been guarded against by a proper stipulation. It is the province of courts to enforce contracts—not to make or modify them. When there is neither fraud, accident, nor mistake, the exercise of dispensing power is not a judicial function.

A charterer agreed to load a ship at Liebeau with barley. The ship went there to receive the cargo. The factors of the shippers informed the master that the Russian government had forbidden the exportation of barley, and that no loading could be furnished. The ship returned in ballast. The charterer was sued for the breach of the contract. Lord Kenyon said: "I am decidedly against the defendant upon the point of law. It is said in Coke Littleton (1), that if a man be bound in an obligation to A., conditioned to enfeoff B., a stranger, and B. refuses, the obligation is forfeited, for the obligor has taken upon himself to make the feoffment. The reason of this is clear. If a man undertake what he cannot perform, he shall answer for it to the person with whom he undertakes. *I am always desirous to apply the settled principles of the law to the regulation of commercial dealings.*"*

A charterer covenanted to freight a ship at Gibraltar with a homeward cargo. A pestilent disease broke out there, and all public intercourse was forbidden by law. The cargo could not have been put on board without danger to all concerned of contracting and communicating the disorder. Lord Ellenborough said: "If in consequence of events which happen at a foreign port the freighter is prevented from furnishing a loading there, which he has contracted to furnish, the contract is neither dissolved, nor is he excused for not performing it, but must answer in damages."†

An owner, by a charter-party, agreed that his ship should proceed from Liverpool to Terceira, and deliver her cargo. Terceira was under blockade, and both parties knew it. There was no intention to break the blockade. The ship

---

\* Blight v. Page, 3 Bosanquet & Puller, 295.
† Barker v. Hodgson, 3 Maule & Selwyn, 271.

did not go. The owner was held liable. The rule laid down in *Paradine* v. *Jane* was cited and approved.*

A ship was chartered to proceed from Charleston to Rotterdam. She went to London, and the master learned that if she proceeded to Rotterdam she would be liable to seizure there and on the way, and to confiscation, under a decree of the Emperor Napoleon, for having touched at a British port. The master refused to proceed, and landed the cargo. Lord Ellenborough said: "Freight could only be earned by performing the terms of the charter-party." The goods "were brought here, instead of being conveyed to their port of destination."† This case, in its essential points, is strikingly like the one under consideration.

In *Lorillard* v. *Palmer*,‡ the vessel sailed on a voyage from Richmond to New York. Finding the Chesapeake Bay blockaded so that it was impossible to proceed without capture, she returned to Richmond. It was held that the shipper was entitled to receive back his goods without paying any freight.

A ship was chartered for a voyage from the city of New York to the city of St. Domingo. The latter was found to be blockaded. The ship was turned away by a blockading vessel, and returned to New York. It was held that the charter-party was dissolved, "and all claim to freight under it gone." The court said: "Nor is this a case for *pro rata* freight. Here was no acceptance of the cargo at an intermediate port." It was added that the owner of the ship may make himself liable for freight by accepting the goods short of the port of destination, upon the grounds of an implied contract, resulting from the partial transportation of the goods and the benefit received. "But when the cargo, as in the present case, is brought back to the port of lading, no such presumption can arise. No benefit has accrued to the owner, nor has he done any act from which an implied contract to pay any freight can be raised."§

---

* Mederos *v.* Hill, 8 Bingham, 235.

† Osgood *v.* Groning, 2 Campbell, 466. ‡ 15 Johnson, 14.

§ Scott *v* Libby, 2 Johnson, 336; see also Abbot on Shipping, 596; Smith

There is nothing in the record to excuse the conduct of the vessel, or to entitle the owner to any part of the stipulated compensation.

It is unnecessary to pursue the subject further. We think the decree of the Circuit Court was in all things correct, and it is

ATTIRMED.

v. Wilson, Ib. 267, 469; Lidard v. Lopez, Ib. 453; Benner v. Equitable Ins. Co., 6 Allen, 222; Chase v. Alliance Ins. Co., 9 Id. 311; Atkinson v. Richey, 10 East, 531; Vliebroom v. Chapman, 13 Meeson & Welsby, 230.