## YE SENG CO. *v.* CORBITT & MACLEAY.

(*District Court, D. Oregon.* September 5, 1881.)

**1. AGENT, WHEN LIABLE ON A CONTRACT.**

A person who signs a contract as agent without disclosing the name of his principal is liable thereon as principal.

**2. AGENCY.**

A person authorized to act for the charterers of a vessel, as agent to procure a cargo in a foreign port, is not thereby authorized to modify or cancel the charter-party of his principal.

**3. IMPOSSIBILITY—WHEN NO EXCUSE FOR NON-PERFORMANCE OF A CONTRACT.**

The owners of a vessel chartered her to carry passengers from Hong Kong to Portland, and stipulated in the charter-party that she was "tight, staunch, and strong, and in every way provided for said voyage;" but upon her arrival at Hong Kong she was found by the surveyor of the port to be "not fit to carry passengers," and refused permission to do so by the local authorities. *Held*, that the owners were not thereby excused from their contract, which was absolute and without condition, to carry passengers out of Hong Kong; and that, even in the absence of the stipulation in the charter-party as to the character and condition of the vessel, the law would imply from the undertaking of the owner that she was in all respects "fit" to carry passengers out of said port.

**4. DAMAGES.**

The charterers procured 200 passengers to ship on said vessel out of Hong Kong at rates that would have netted them $14 apiece, or $2,800 in the aggregate, which gains they were prevented from making by the failure of the owners to perform their contract. *Held*, that the prevention of these gains was a damage to the charterers which naturally arose from the breach of the contract, and must also have been in the contemplation of the parties thereto, and therefore they are entitled to recover them in a suit for such breach.

**5. MONEY PAID INTO COURT.**

Money paid into court by a defendant is an absolute admission that so much is due upon the claim of the plaintiff and is so far a payment thereof, and the better opinion seems to be that the defendant may receive said deposit pending the litigation; and, in any event, he may prosecute his action for the remainder of his claim, subject to the risk of paying costs if he recover no more than the tender.

In Admiralty.

*William H. Effinger*, for libellants.

*Benton Killin*, for defendants.

DEADY, D. J. The libellants, Ye Seng Company, composed of sundry Chinese merchants of this city, bring this suit to recover $5,957.80 from the defendants, as damages, with interest, for the non-performance by them of a charter-party executed in this city on August 20, 1879, for the American bark Garibaldi. By the agreement "Messrs. Corbitt & Macleay, agent for owners of the American bark Garibaldi, of Portland, Oregon," of 670 tons burden, chartered

her "between-decks" to the libellants for a voyage from Hong Kong, China, to Portland, to carry "passengers and (or) freight" in number as permitted by the laws of the United States, upon the terms and conditions following: "The said vessel shall be tight, staunch, and strong, and in every way fitted and provided for said voyage;" the libellants to provide at Hong Kong the "passengers and freight as aforesaid, and furnish bunks, cook-houses, water-closets, and hatch-houses, and everything necessary to the carrying of passengers," and to pay the defendants "for the use of said vessel" during said voyage $2,900,—one-half before the vessel left Hong Kong, and the remainder upon her arrival at Portland; but, "if no cargo and all passengers, full amount payable in Hong Kong."

The "lay days for loading at Hong Kong" were to be from March 1 to April 1, 1880, and any detention caused by either party was to be compensated for by the payment to the other of demurrage at the rate of $50 per day. The charter-party contained the following stipulation: "To the true and faithful performance of all and every part of the foregoing agreement, we, the said parties, do hereby bind ourselves, our heirs, executors, administrators, and assigns, each to the other, in the penal sum of amount of charter;" that is, $2,900. It was also stipulated that "security" should "be given for the performance of this agreement in the sum of $500," previous to the sailing of the vessel on her voyage to China. No attention seems to have been paid to this provision, except by the libellants, who, on February 26, 1880, advanced the defendants $500 earnest-money on the voyage from Hong Kong to Portland, erroneously stated in the answer to have been paid before the bark left Portland for the former place. The agreement is signed by the libellant, Ye Seng Company, and the various mercantile firms that compose the adventure, and by "Corbitt & Macleay, agents for owners."

In October, 1879, the Garibaldi left Portland for Hong Kong, where she arrived about the end of that year. Hop Kee, a Chinese merchant at Hong Kong, was the agent of the libellants to deliver the cargo of freight and passengers, for which he was to receive a commission of 5 per centum. When the vessel arrived at Hong Kong shipping was scarce and coastwise freights were high. Soon after her arrival in port, and before January 31, 1880, the master, Thomas J. Forbes, informed Hop Kee that he would not be allowed to carry passengers out of that port on the Garibaldi; and on January 31st she was surveyed by R. McMurdo, the "surveyor for the government and local offices," who made and furnished the master a

certificate, over his signature and seal of office, containing a description of the vessel and the following statement under the head of "General remarks upon the vessel and character of the risk:" "Vessel docked and metaled at date under inspection of the undersigned; now tight and in order, but not a fit vessel to carry passengers." These facts were at once communicated to the defendants by cable and mail, and they instructed the master to do the best he could with her, and she went into the coasting trade, where she remained until she was disposed of in the following July.

On February 13, 1880, Nathaniel Ingersoll, who procured the charter for the libellants, wrote Forbes from Portland, enclosing a copy of the charter-party for the use of Hop Kee, and telling him that Ye Seng Company wished to be advised by mail when he was ready to sail for Portland.

On March 4, 1880, at the instance of Forbes, Hop Kee wrote across the face of the copy of the charter forwarded to him by Ingersoll, "This charter-party is cancelled in consequence of the emigration office of Hong Kong refusing to permit the Garibaldi to carry passengers," and signed the same "Hop Kee, agent for charterers;" and on the same date Forbes addressed a note to "Messrs. Hop Kee & Co., agents for charterers of Garibaldi," as follows:

"In consequence of the emigration office of Hong Kong refusing to permit my ship to carry passengers, I hereby certify that you have cancelled the charter-party, dated Portland, Oregon, twentieth August, 1879."

. [Signed] "T. J. FORBES, Captain Garibaldi."

The libellant contests the right of Hop Kee to cancel the agreement, and the counsel for the defendants admits that the evidence does not prove it. His agency appears to have been confined to the fulfilment of the charter at Hong Kong, without any authority to modify or cancel it. Nor will the law imply the greater authority from the less—the power to abrogate from the power to fulfil or carry out. Maclachlan, L. of M. S. 360; *Rich* v. *Parrott*, 1 Spr. 358. Nor is it clear that Hop Kee actually undertook to release the defendants from their obligation under the agreement, but only formally to admit the fact that as it had become impossible, as he understood it, for the defendants to perform their part of the contract, it was, in his judgment, practically at an end.

The answer of the defendants alleges that the Garibaldi, on August 20, 1879, was owned by the Ocean Ship Company, a corporation formed under the laws of Oregon, and that the defendants made said charter-party as the agents of said company and not otherwise, and

therefore they are not liable thereon; and on the trial it was admitted that such was the fact, and also that the stock of such corporation was substantially owned by the defendants Kenneth and Donald Macleay. But it also appears from the evidence that while defendants signed the charter-party as agents, they did not disclose the name of their principal, nor was it ever known to the libellant until after the commencement of this suit. Under these circumstances the liability of the defendants is undoubted. Although agents in fact, they have so dealt with the libellant as to render themselves liable as principals.

The rule of law upon the subject is clear and just. Story, in his Agency, §§ 266-7, says:

"A person contracting as agent will be personally responsible when, at the time of making the contract, he does not disclose the fact of his agency. * * * The same principle will apply to contracts made by agents, when they are known to be agents and acting in that character, but the name of their principal is not disclosed; for until such disclosure it is impossible to suppose that the other contracting party is willing to enter into a contract exonerating the agent and trusting to an unknown principal, who may be insolvent, or incapable of binding himself."

To the same effect is the rule laid down in 2 Kent, 630; and it was expressly affirmed in *Winsor* v. *Griggs*, 5 Cush. 210.

In Maclachlau, L. of M. S. 355, it is laid down that one who executes a charter-party "in his own name, although he is agent for another, and notwithstanding he adds this, being merely a description of himself, whether in the body of the contract or after his signature, may sue or be sued thereon." But it was suggested by counsel on the argument that as the Garibaldi appears to have been an American vessel belonging to this port, an examination of the record of her enrolment in the custom-house would have shown the fact of her ownership, and that the libellant must be conclusively presumed to have known what he might have thus learned. No authority is cited in support of this proposition, and I can hardly think it was seriously made. In any event it is radically wrong, because it assumes that it was the duty of the libellant to ascertain who, if any one, was the defendant's principal. On the contrary, it was the duty of the defendants, if they did not want to be held personally liable on the contract, to disclose the name of their principal. However, in this case the application of the rule is not a serious matter, because the defendants—the Macleays and the Ocean Ship Company—are substantially one and the same person; they own their principal and are practically responsible for its debts and liabilities.

The libellants allege that they suffered damage by reason of the non-performance of the agreement by the defendant in this: That their agent Hop Kee had purchased, and was ready to deliver on said vessel before March 1, 1880, 2,440 mats of rice of $46\frac{1}{2}$ pounds each, and 200 boxes of nut oil of 72 pounds each, and that they had disposed of the same, to arrive at this port per the Garibaldi, at a net gain of $881.80—$780.80 on the rice, and $101 on the oil; and that before said date they had secured 265 passengers for the return trip of said vessel, at the rate of $40 per head, and would have made upon the carrying of the same, after defraying all expenses of transportation, board, etc., the net profit of $4,076; that they were compelled to expend $500 in returning these passengers from Hong Kong to their respective homes, upon the failure or refusal of the defendants to take them to Oregon; and that freights were then so high that the libellants could not procure other transportation for said freight and passengers and realize any profit thereon. Unfortunately, Hop Kee died without his deposition being taken, and what he did in and about the carrying out of this contract is not clearly shown. However, upon the evidence in the case it does not appear that he purchased any rice or oil for the libellants, as alleged, for the reason, in all probability, that Forbes told him early in January, in effect, that the Garibaldi would not return to Portland. Neither is the evidence satisfactory as to the claim for $500 alleged to have been paid for returning the proposed passengers to their homes. And, on the argument, I understood the counsel for libellants tacitly to abandon the claim for damages on these accounts. But it does appear from the evidence that Moy Toy and Fune Gib, who were passengers to Hong Kong on the Garibaldi, procured, as agents or runners for the libellants, 200 passengers for Portland, at $40 apiece; but as the master of the Garibaldi had given Hop Kee notice that she would not make the voyage, he was compelled to decline to sell them tickets therefor.

It also satisfactorily appears from the evidence that there were no other means available to the libellants for transporting said passengers, and that the price of passage on the regular steamer to San Francisco was $60 per head. The transportation of 200 passengers for $2,900—the price of the charter—would cost $14.50, and from the evidence it appears that it would cost not to exceed $12 apiece more to board and take care of them on the voyage; so that it follows that the libellants stood to make $2,800 net profit on the venture, and were only prevented from doing so by the failure of the

defendants to keep their contract and make the promised voyage. The libellants have at least sustained a loss of $2,800 in gains prevented by this failure of the defendants to keep their contract, and in my judgment they are such damages as arise naturally from the breach of the contract, and must also be considered as within the contemplation of the parties thereto when they made it; and are, therefore, recoverable in this suit. *Hadley* v. *Baxendale*, 9 Exch. 341; *Griffin* v. *Colver*, 16 N. Y. 489; *Ogden* v. *Marshall*, 4 Selden, 340; Sedg. Dam. 79.

The stipulation in the charter that either party shall be liable to the other in the penal sum of $2,900 upon a failure to perform any part of the agreement, was intended, in contemplation of law, not as a measure of damages, but as a penalty, to be enforced only to the amount of the actual damages sustained by such failure. *Harris* v. *Miller*, U. S. C. C. Dis. Or., March 8, 1880; Sedg. Dam. 399, 421, note 1. But this being a suit, not for the penalty, but upon the covenants in the contract for damages for a breach thereof, the amount recovered may exceed such penalty. *Lowe* v. *Peers*, 4 Burr. 2225; *Harrison* v. *Wright*, 13 East, 343; *Winter* v. *Trimmer*, 1 Black, 395; Abb. on Ship. 285; Sedg. Dam. 423.

In their answer the defendants allege that the parties were mutually released from the obligation of the charter-party by reason of the alleged cancellation of the same by the master and Hop Kee; but it not appearing that the latter had authority to make such cancellation, that defence is abandoned, and it is now insisted that the contract to furnish and receive freight and passengers on the Garibaldi at Hong Kong for Portland was a contract so far to be performed in the former place, and, being prohibited there, it was invalid, and therefore bound neither party to it. But this proposition assumes what is not proven. There is no evidence that it was unlawful to carry passengers out of Hong Kong on a suitable vessel—one that was "staunch and strong," and reasonably safe for them to venture their lives upon. The defendants expressly covenanted in the charter-party that the Garibaldi was such a vessel, and in such condition; and, if they had not, the law would imply a covenant on their part that the vessel was "fit" to do what they undertook to do with her— carry passengers out of Hong Kong. Maclachlan, L. of M. S. 406; *The Merrimac*, 2 Sawy. 593; *Lyon* v. *Mills*, 5 East, 428; *Stanton* v. *Richardson*, 9 C. P. 390; 1 Pars. Ship & Adm. 284. Nor was the duty and responsibility of the defendants in this respect affected by

the fact that the agent of the libellants for the negotiation of the charter may have known, or did know, the condition of the Garibaldi at the date of the charter-party, because he surveyed her a year before, or for any other reason. 1 Pars. Ship & Adm. 285, note 3. They undertook, without qualification or condition, that the vessel was "fit" not only to carry passengers generally, but also out of the port of Hong Kong, according to the laws and regulations thereof.

The Garibaldi appears to have been built at Stockton, California, in 1860, and had been engaged for some years in carrying passengers between Hong Kong and this port. By the survey at Hong Kong in January, 1880, she was found "not fit" to carry passengers, probably on account of weakness resulting from age. Hop Kee told the Chinese runners, when they came to him to purchase tickets for the passage out, that the Garibaldi would not take them because Forbes said she was too *old*. The certificate says she is "tight and in good order," but omits to say that she is "staunch and strong," as represented in the charter-party. And it may be that the master did not object to the vessel being found unfit to carry passengers to Oregon, if she was thereby free to engage in a more profitable trade on the coast of China, where, according to the testimony of Noyes, the mate, she earned $1,400 in a voyage of a few days. Counsel for the defendants also object that the certificate of the marine surveyor is not competent evidence of the unfitness of the Garibaldi to carry passengers. But it was an official act procured by the defendants, upon the strength of which the emigration office, according to the written statement of the master delivered to Hop Kee, refused to permit the vessel to carry passengers out of the port. If the certificate is true, as *prima facie* it is, then undoubtedly the defendants failed to keep their agreement that "the said vessel shall be tight, staunch, strong, and in every way fitted and provided for said voyage;" and if it is not true, and the order thereon refusing to permit the Garibaldi to carry passengers was wrongfully made, the result is the same, because the defendants not only undertook that their vessel was in a condition to carry passengers out of Hong Kong, but that she would do so without any qualification or condition, as that she should be found qualified or permitted to do so by the local authorities.

In *Paradine* v. *Jane*, Aleyn, 26, the court said:

"When the party, by his own contract, creates a duty or charge upon himself, he is bound to make it good, if he may, notwithstanding any accident by inevitable necessity, because he might have guarded against it by his contract."

In *The Harriman*, 9 Wall. 172, the supreme court say:

"The principle deducible from the authorities is that if what is agreed to be done is possible and lawful, it must be done. Difficulty or improbability of accomplishing the undertaking will not avail the defendant. It must be shown that the thing cannot by any means be effected. The answer to the objection of hardship in all such cases is that it might have been guarded against by a proper stipulation;"

And cite with approbation *Blight* v. *Page*, B. & P. 295, where Lord Kenyon held that a charterer who agreed to load a vessel with barley at Liebeau, but did not, because the Russian government had forbidden the exportation of barley, was liable for the breach of his contract, saying:

"If a man undertake what he cannot perform, he shall answer for it to the person with whom he undertakes. I am always desirous to apply the settled principles of the law to the regulation of commercial dealings."

To the same effect is the ruling in the case of *West* v. *Steamer Uncle Sam*, MacAllister, 505, and the citations of comments in Machlachlau, L. of M. S. 543. But if this certificate and the letter from the master to Hop Kee of March 4th are not *prima facie* evidence of the facts that the vessel was found unfit to carry passengers, and the refusal thereon of the local authority to allow her to sail with them, what becomes of the defence that this contract could not be performed by the defendant because it was contrary to the law of the place of performance—Hong Kong? This certificate and letter are the only evidence of such illegality, and without them there would be no pretence of an excuse for the non-performance of the contract on the part of the defendants.

It is also alleged in the answer, and testified to by the master, that when he arrived in Hong Kong, Hop Kee told him that he had not secured any freight or passengers for the Garibaldi; and upon this it is claimed that the libellants were first in fault, and this was the controlling reason why the contract was considered at an end by the master and Hop Kee. But, admitting that Hop Kee had not secured any freight or passengers when or before the Garibaldi arrived at Hong Kong, it does not follow by any means that the libellants were therefore in fault in this matter. It was not agreed or expected that the freight or passengers would be engaged by the arrival of the vessel in December or January. Indeed, the libellants had until the first of April to load the vessel, and as much longer as they chose, by paying the demurrage agreed upon, while the defendants were not bound to be in port or receive cargo before the first of March.

It may be, then, that Hop Kee, when asked by the master in December or January, said he had not secured any freight or passengers, but that does not prove that he did not intend to or would not before the expiration of the lay days. How could he be expected to have procured a cargo when, so far as appears, his instructions to do so went out on the Garibaldi. That he did not afterwards procure the rice and oil, and accept the passengers that Moy Toy and Fune Gib had engaged in the mean time, was doubtless due to the fact that in a few days thereafter the master told him in effect that the vessel would not return to Portland.

The answer admits the liability of the defendants, as agents of the owners, to repay the $500 received by them as earnest money; and therewith they brought into court $562.33, that being the amount, with interest and costs of suit, to date,—December 3, 1880,—and "tendered the same to the libellants," who received the amount from the clerk on December 23d. It is now contended that this sum was tendered in full of all claims in this suit, and that the acceptance of it by the libellants is a satisfaction of the whole claim and a bar to any further recovery.

A payment of money into court without a plea of a previous tender, operates as a tender from that date, and admits so much of the cause of action. But the plaintiff is not thereby precluded from prosecuting his action for the remainder of his claim, although he cannot recover costs if he fails to recover more than the sum tendered, and may be required to pay them. But whether the plaintiff may take this money out of court, pending the litigation, either by his own motion or by leave of the court, is a question. In *Alexandria* v. *Patten*, 1 Cranch, it was said by the court, without argument, that on a plea of tender the plaintiff cannot take the money out of court and proceed for more; and in 2 Pars. S. & A. 486, it is said: "The practice in the English admiralty is, when money is paid into court as a tender, not to pay it out until the conclusion of the case;" citing *The Annie Childs*, Lush. Adm. 509. But in *Murray* v. *Bethune*, 1 Wend. 191, it was held that when money is brought into court, pending an action for the same and more, it is a payment *pro tanto*, and the plaintiff has a right to take it out, but the defendant not. And this, in my judgment, is the more convenient and therefore the better rule. The deposit in court is an unconditional admission that such an amount is due, and a tender of the same and more; it is so far a payment beyond the power of the party to recall. See, also, *Spalding* v. *Vandercook*, 2 Wend. 431; *Sleght* v. *Rhinelander*, 1 Johns. 202.

By reason of the failure of the defendants to perform their contract, the libellants have suffered damage, and are entitled to recover at least the $2,800 gains which they were thereby prevented from making on the transportation of the 200 passengers engaged for the voyage, with interest from the date the Garibaldi might have completed the voyage to this port, say June 1, 1880, amounting in all to $3,173.33⅓, with the costs and expenses of suit. There will be a decree accordingly.