THE ADELLA S. HILLS.[1]

JENKINS v. A CARGO OF 9,250 BAGS OF SUGAR et al.

(District Court, E. D. New York. July 7, 1891.)

1. CARRIERS OF CARGO—DELIVERY—RECEIPT OF CARGO BY CONSIGNEE.
   On a vessel's arrival at her port of discharge, no owner appeared to receive the cargo, and it was placed in store by the master, subject to the ship's lien for freight. Subsequently, on suit begun against the cargo for the freight, the owner appeared and took the cargo, giving security for the freight. Held, that the cargo owner could not thereafter contend that no delivery had been made.

2. SAME—DISCHARGE INTO STORE—RIGHT DELIVERY.
   A vessel with a cargo of sugar arrived at her destination with water in her hold, due to perils of the sea, and which was melting the cargo. No consignee appeared with authority to claim the cargo. On surveys by the port-warden and the surveyor of the Marine Underwriters, an immediate discharge was recommended. The master in good faith placed the cargo in store. Held, that it was a reasonable and legal discharge, and constituted a right delivery, entitling the ship to freight.

3. SAME—EXPENSES OF SURVEY.
   Under such circumstances, the vessel is entitled to recover of the cargo the expenses of the survey.

4. SAME—CONSIGNEE'S AUTHORITY—RIGHT OF SHIP TO KNOW.
   When by bills of lading cargo is consigned to order, it is the right of the ship to be informed, by an inspection of the indorsements on the bills of lading that have been signed and delivered by the master, as to who is entitled to receive the cargo.

In Admiralty. Suit to recover freight.

[1] Reported by E. G. Benedict, Esq., of the New York bar.

*Butler, Stillman & Hubbard,* for libelant.
*Weeks & Foster,* for respondent.

BENEDICT, J.   This is an action for freight.   It is founded upon a charter-party made at Pernambuco, November 17, 1887, between David Jenkins, master of the bark Adella S. Hills, and the firm of Parenta, Vianna & Co., of Pernambuco.   This charter-party provided for a full cargo of sugar in bags, to be laden on board the bark at Natal, and transported therein to either New York, Baltimore, Philadelphia, or Boston, as ordered on signing the bills of lading; or, at charterers' option, the bark to go to Hampton Roads or Delaware break-water for orders to discharge at one of the above-named ports.   The charter-party contained, among other provisions, the following:

"The captain shall sign bills of lading at any rate of freight the charterers may desire, without prejudice to this charter, but not under chartered rates. The acts of God, the national enemies, and fire, and all other damages and accidents of the seas, rivers, or navigation, of whatever nature or kind whatsoever, during the said voyage, always excepted.   The cargo to be delivered at port of discharge, according to the custom of respective ports.   The freight to be paid on the unloading and right delivery of the cargo in cash.   Thirty running days are to be allowed the said charterers, if the ship be not sooner dispatched, for loading the ship, waiting for orders, and discharging.   The charterers' agent to designate the wharf and head stevedore and men for discharging, the usual costs being paid by the vessel, on condition he does not pay more than others; the master having option to employ his own crew to discharge."

Under this charter-party a cargo of sugar was duly laden on board the vessel at Pernambuco by the charterers.   The loading commenced on the 2d day of December, 1887.   On the 5th of December the master signed and delivered to the charterers a bill of lading for 200 bags, to be delivered to the order of the charterers at the port to be designated, in accordance with the provisions of the charter-party.   On the 13th of December the master signed and delivered to the charterers another bill of lading for 4,000 bags, to be delivered to the order of the charterers at the port designated, according to the provisions of the charter-party. On the 20th of December the master signed a third bill of lading for 3,250 bags, to be delivered to the order of the charterers at the port designated, according to the provisions of the charter-party.   On the 29th of December the ship sailed for New York, that port having been designated as the port of discharge by the charterers.   Twenty-two days were expended in the loading at Natal, leaving eight lay-days in New York for the discharge of the cargo.   The voyage to New York was duly performed by the ship in accordance with the charter, and the ship arrived at New York on February 4th.   During the voyage the ship encountered very heavy weather.   The testimony of the master is that in all his experience of 45 years at sea he had never encountered such rough weather. During the voyage the ship labored greatly, and was badly strained. Seas frequently washed over the decks.   The cabin was filled on more than one occasion, and the sugar was wet to such an extent that the

draft of the ship was diminished some nine inches by reason of the pumpings of dissolved sugar. Upon the arrival of the ship in New York, no person appeared with authority to act as agent of the charterer or consignee of the cargo under the bills of lading, and the master was without knowledge to whom, if to any person, the bills of lading had been indorsed. An advertisement for the consignee of the cargo was published in the newspaper of February 11th, without result. Inasmuch as the pumpings showed that the sugar had been damaged and was dissolving by reason of the sea-water shipped during the voyage, the master caused a survey to be held by a port-warden, and also by a surveyor of the Marine Underwriters. Each survey resulted in a recommendation that the cargo be discharged immediately. Accordingly, on the 7th of February, the master commenced to discharge the cargo, placing it in store, subject to the ship's lien for freight. The discharge was completed on February 13th, on which day the lay-days provided by the charter for the discharge of the cargo terminated. The cargo proved to have been seriously damaged by sea-water. A considerable part was wet, some bags were empty, the contents have been entirely dissolved. No question, however, is made in this case either as to the quantity or the condition of the sugar placed in store by the ship. On the 26th of March, the freight not having been paid, the master of the ship commenced this action against the sugar, and also against Allerton D. Hitch, as owner of the sugar. Thereupon said Hitch filed a claim on the cargo as the owner thereof, and, upon his giving a stipulation to pay the amount decreed in this action, he received the sugar, it being still in the store-house where it had been placed by the master of the ship. Thereafter the said Hitch filed an answer, setting up as the sole defense against the libelant's demand for freight that the cargo had never been delivered as required by the charter-party. Upon this statement the libelant is, as it seems to me, entitled to a decree for his freight. It will be observed that the case as presented is not one of non-performance or part performance of the voyage. The whole voyage was performed exactly as provided by the charter-party. Nor is the case as presented one where it is sought to recoup against the freight certain damages sustained by reason of neglect, on the part of the ship, of some provision in the charter-party. The answer, although it contains a statement that the discharge of the cargo into store was without the authority and "to the damage of the claimant," states no amount of damage sustained by the claimant, makes no attempt to describe any such damage, and does not claim a reduction from the freight by reason of such damage. The only question raised by the answer is whether there has been a delivery of the cargo, and that question must be decided adversely to the claimant upon the record itself; for, although delivery of cargo is not always made by discharging it into store subject to the lien for freight, when cargo so discharged is taken by the freighter from the store, upon giving security for the freight, it is no longer open to him to say that no delivery has been made. Perhaps, in strictness, the libelant, by a supplemental averment, should have pleaded the fact, which appears by the record,

that the cargo had been received by the claimant subsequent to the filing of the libel upon the stipulation given. But, treating the record as amended to conform to the fact in this particular, it seems manifest that the libelant must have a decree for the freight upon the record alone, inasmuch as it appears that the ship has duly performed the whole voyage required by the charter; that the whole cargo has been discharged at the proper port of discharge, in like condition as shipped, dangers of the seas excepted; and the cargo has been there received by the party entitled to receive it, without loss or damage arising from any neglect of the ship. I say, without loss or damage, because the respondent makes no claim for loss or damage in his answer. But it is plain from the testimony that the act of the master in putting the cargo in store before the expiration of the lay-days, which is the only act complained of, caused no loss. The cargo went to a proper store. It was there subjected to no charge but what would have been incurred by the respondent in placing it in any store, with no diminution of value or incurring of expense by reason of having been put in store by the master instead of by the respondent. Some evidence was given to show that the expense to the respondent would have been less if he had sold the cargo *ex* ship, but it also appears that there was no intention of selling the cargo *ex* ship. The ship arrived on a falling market. This very cargo, although received by the respondent in March, was kept in the same store by him until the following December. The same respondent had several other cargoes of sugar arrive at about the same time as this one, and he stored them all. There is also evidence that the respondent did not designate the wharf or the stevedore, but there is no evidence that the respondent owns a wharf himself, or that any loss or inconvenience was caused by the selection of the wharf that was made by the master, or by the selection of a stevedore by the master. The stevedore was, by the terms of the charter, to be paid by the ship; and for aught that appears, so far as I recollect the testimony, the master may have discharged the cargo by his own men, as the charter gives him the right to do, so that it can well be found as a fact that the omission of the master to wait until the expiration of the lay-days before discharging his cargo caused no delay or damage to the respondent. This no doubt explains why no claim to recoup damages is made in the answer, and non-delivery the sole ground of defense stated; so as already stated, non-delivery being the sole ground of defense, the record shows the libelant entitled to a decree. The case of *Metcalfe* v. *Iron-Works Co.*, 2 Q. B. Div. 423, (Ct. App.,) relied upon by the respondent, was a case where the cargo was discharged and stored at an intermediate port, and, the voyage not having been performed, the cargo was taken by its owners under protest that the voyage was not completed. Here the voyage was completed, and all that remained to do was to deliver the cargo upon payment of freight. No freight being paid or tendered, the cargo could be discharged into store subject to the lien for freight, and, when it was taken thence by the owner upon giving security for the freight, there was no room left to contend that it was never delivered. Moreover, the decision made in

the queen's bench (1 Q. B. Div. 635) in *Metcalfe* v. *Iron-Works Co.*, contains an intimation that, if it had there appeared that the freighter derived any benefit or advantage whatever from the carriage of the cargo, the judgment would have been different, and in accordance with that "larger equity" administered by admiralty courts in such cases.    Here moderate equity requires that the ship be paid her freight; for, as already shown, the discharge of the cargo into store was without loss or damage to the freighter, who has therefore received the full benefit of the carriage of the cargo for which he had contracted in the charter. Having received the full benefit of the service engaged, he should pay the stipulated reward.    This principle of the maritime law alluded to by the court of queen's bench is also alluded to by the supreme court of the United States in the case of *The Harriman*, 9 Wall. 161, cited by the respondent, where (page 170) the question is stated to be whether the non-fulfillment of the contract was excused by fault or waiver on the part of the charterer, or by other facts disclosed in the proofs, so as to entitle the owner to all or any part of the freight money.    In the present case the other fact disclosed by the proofs is that, although the cargo was discharged before the expiration of the lay-days provided in the charter, it came to the hands of the freighter without loss or damage to him by reason of the time of the discharge, and therefore the ship is entitled to all the freight.

There is also another ground upon which the claim to recover this freight must be upheld, and that is, that the discharge of the cargo into store by the master of the ship was a fulfillment of the charter, and therefore he is entitled to his freight.    Here mention must be made of some further facts not hereinbefore stated.    It has already been stated that the cargo was, by the bills of lading, made deliverable to the order of the charterers.    The answer states that the ship was ordered to New York by the charterers; that the charterers, by an indorsement on the bills of lading, made the cargo deliverable to Henry Forster & Co., of Pernambuco; and that Henry Forster & Co. indorsed the bills of lading, and thereby made the cargo deliverable to the order of the London & Brazilian Bank.    Where the London & Brazilian Bank is located does not appear, but it may doubtless be presumed that it was located in New York city.    There is no evidence that the charterers had any agent in New York.    No claim to the cargo was ever made upon the ship by the London & Brazilian Bank, or by any one in their behalf, and, up to the time of commencing to discharge the cargo into the store-house, no one had exhibited to the ship authority to receive the cargo as its consignee under the bills of lading, nor to act as agent of the charterer.    It is true that on February 6th the respondent had stated to the agent of the ship that he had received the duplicate papers, and knew the cargo was consigned to him; but he at the same time stated that he did not have the bills of lading, and his testimony discloses that, at the time of his interview with the ship's agent, he did not have the bills of lading.    He was not then in fact the consignee of the cargo, and had no right to receive it or to direct as to its discharge.    On the 7th of February, and after the

discharge of the cargo had commenced, the respondent in writing notified the master that he represented the owners of the cargo, and that he should hold the master liable for all damages and expenses which might be incurred by reason of the discharge. But he did not then exhibit to the master or to the ship's agent any document or other evidence purporting to confer upon him authority to represent the owners of the cargo. Even as late as the 8th of February, the respondent wrote in a letter to the master, "By inquiring at the custom-house, you will learn who is the consignee of the cargo in question;" thus leaving it to be inferred that he was not the consignee. If he was then the consignee, why did he not say so? Evidently the respondent labored under the impression that the ship must accept his statement that he was consignee of the cargo. He says, when asked why he did not exhibit his authority to the ship's agent: "Why should I show my authority to Mr. Boycsen? I have a great many cargoes of sugar, and have never shown my authority to an agent of a ship." This impression was wrong. When by bills of lading cargo is consigned to order, it is the right of the ship to be informed, by an inspection of the indorsements on the bills of lading that have been signed and delivered by the master, as to who is entitled to receive the cargo. This, then, was the position of the ship when she commenced to discharge her cargo into store on February 7th. She had been in port since the 4th. Her cargo was sugar that had been wet by peril of the sea, and was melting away to the loss of its owner, whoever he was. The duly-constituted authority of the port had recommended an immediate discharge of the cargo, and there was no agent of the charterer or consignee of the cargo at hand, as there should have been, to direct or to forbid the discharge. The respondent was at hand, but he had no authority in the premises, or, if he had, declined to exhibit it. The master of the ship then became entitled to act for the interest of the cargo.

I do not agree with the contention that the charter, by providing "thirty running days are allowed the said charterers, if the ship be not sooner dispatched, for loading the ship, waiting for orders, and discharging," permitted the consignee to remain undisclosed, and give no orders respecting the discharge for eight days after the ship was ready to discharge. The words "waiting for orders" refer to orders as to the destination of the ship. Those orders had been given in Natal, and in pursuance thereof the vessel had proceeded to New York. No doubt the provision permitted the consignee of the cargo to come forth and elect to use the whole eight days, notwithstanding the loss to which the cargo would be subjected by the delay; but the difficulty with the respondent's case is that he did not come forth and show himself authorized to act for the cargo, and by omitting so to do he put upon the master the obligation to act upon his own judgment as to the proper disposition to be made of the perishing cargo. Under such circumstances, the master became the representative of the owner of the cargo, so far as its preservation was concerned; and if his action in placing it in store was in good faith, as it is shown to be, and was reasonable, it appears, by

v.47 f.no.1—6

the fact that it entailed no loss upon the freighter, that it was legal. "What is reasonable and just in such cases is likewise legal." Sir WILL-IAM SCOTT, *The Gratitudine*, 3 C. Rob. Adm. 267. If legal, it accomplished a right delivery of the cargo at the port of destination, and entitled the ship to her freight.

The libelant claims, in addition to his freight, the sums expended by him in having the cargo surveyed. The ground upon which the master asks to be paid these sums is that the expenditure was made necessary by reason of the absence at the port of entry of any person shown to be authorized to act as agent of the charterers or as consignee of the cargo. This claim appears to me to be just, and is therefore allowed. In what has been said the case has been treated as if the respondent had not been joined as a defendant, and the case a simple proceeding *in rem.* I do not see any good reason for making the respondent a party defendant; but as the respondent is also the claimant, and has signed the stipulation upon which the cargo was discharged, his presence as party defendant requires no further notice. Let a decree be entered in favor of the libelant for the balance of freight unpaid and the surveyor's fees. The parties will doubtless agree upon the amount; if not, let there be a reference to ascertain the amount.