Phyllis SANTLEBEN, et al., Plaintiffs,

v.

CONTINENTAL AIRLINES, INC., Defendant.

No. CIV.A.H–00–1436.

United States District Court, S.D. Texas.

Dec. 20, 2001.

Jeffrey T. Embry, Dallas, TX, for Plaintiffs.

Nicholas E. Zito, Houston, TX, for Defendant.

Opinion on Warsaw Convention Claim

HUGHES, District Judge.

1. *Introduction.*

Mother and daughter flew from Italy to Washington, D.C., then on to Texas. Both were injured on their return flight to Washington. They have sued the airline, claiming under the Warsaw convention on international travel. Because the flight from San Antonio to Washington was a domestic contract of carriage distinct from the contract for the international flight, the convention does not apply.

2. *Background.*

Phyllis Santleben was a teacher in Italy for the U.S. Department of Defense. Civilian employees of the American military travel free from their duty station to their home of record—Bethesda, Maryland, in Santleben's case. In 1998, she and her daughter, Deborah Ammoniaci, booked travel from Italy to the United States through the SATO travel agency in Sigonella, Italy. They arranged to fly on June 30 on a military transport from Sigonella, arriving on July 1 in Baltimore and returning by Delta Airlines from Washington through New York and Rome to Venice on August 18. SATO issued the invoice for these flights on June 24.

Mid-flight on July 1, the transport was diverted to Norfolk. In Norfolk, Santleben bought tickets on United Airlines to fly that same day to Washington.

On July 2, Santleben flew on Continental Airlines from Baltimore through Houston to San Antonio. Santleben had purchased her ticket from Cruises Tours International, a Washington travel agency, with a credit card on June 1. Ammoniaci stayed in Baltimore to visit her father.

On July 25, Ammoniaci flew from Washington and joined her mother in San Antonio. She, too, flew on Continental, with tickets purchased by her father on June 1 through Travel and Transport, an Omaha travel agency.

On August 17, on the return legs of the tickets bought on June 1, mother and daughter flew from San Antonio to Houston, where they connected to Continental flight 538 to Washington. They planned to connect with their original SATO itinerary in Washington and return to Italy, beginning with Delta flight 746 from Washington to New York the next afternoon.

Flight 538 hit turbulence, injuring Santleben and Ammoniaci. They are suing Continental for the injuries they sustained on the Houston–Washington flight, claiming the benefits of the strict liability imposed by an international convention.

### 3. *The Warsaw Convention.*

The Warsaw Convention, adopted by the United States in 1934, established uniform rules for handling claims arising out of international travel. It imposes strict liability on carriers while limiting damages. Before the convention, international carriers were subject to claims in the justice systems of a variety of nations. Damages were unpredictable and opportunistic. The carriers shifted this economic risk to passengers, who paid more to travel than under a stable, predictable regime. Since its adoption, the convention has facilitated international travel and eased the process of recovering for injuries that occur during transit. The convention is a trade-off. In exchange for liability caps and rule uniformity, carriers face strict liability for accidental injuries to passengers.

Unless it proves the passenger's negligence, a carrier is strictly liable to passengers who are injured on an aircraft. After the Montreal Agreement of 1966, liability was capped at $75,000, including legal fees. The difference is stark: If the convention applies, a carrier is strictly liable but faces only limited damages. If it does not, the passenger must prove the carrier's negligence, but the carrier faces unlimited damages.

For the Warsaw convention to apply, transportation must be international according to the parties' contract, and the parties must have viewed the transportation as an undivided operation. The departure and destination points in the contract are crucial. International travel can occur under one contract or a series of contracts, and it exists if the departure and destination are in the territories of two sovereigns. 49 U.S.C. § 40105, Art. 1(2). A domestic carrier falls under the Warsaw convention if it knows it is being used as a component of international travel and expresses that knowledge in its contract. 49 U.S.C. § 40105, Art. 1(3).

### 4. *The Contract.*

On June 1, Santleben contracted with Continental. In exchange for payment, the company would fly her on July 2 from Baltimore through Houston to San Antonio and return her to Washington on August 17. Ammoniaci's father contracted with the airline on her behalf on June 1. The contract was similar to Santleben's, with the trip beginning in Washington on July

25. Ammoniaci's invoice reflects round-trip travel from Washington through Houston to San Antonio. Santleben's ticket, had she produced it, would have shown an itinerary similar to her daughter's. The parties agreed in writing that the destination was Washington. Neither contract establishes a connection to other travel. Only Santleben and Ammoniaci knew Continental's flights related to their international travel plans.

At the time of the international contract, there was no domestic leg. The domestic trips were not a component of international travel as would have been the case if the women had been injured on the New York–San Francisco leg of a Milan–New York–San Francisco–Shanghai itinerary.

5. *Contract Interpretation.*

 The general principles of contract interpretation govern travel contracts. *See The Harriman,* 9 Wall. 161, 76 U.S. 161, 19 L.Ed. 629 (1869). When a contract is unambiguous, the objective intent of the parties as expressed in the writing controls the contract's interpretation. *See* WILLISTON ON CONTRACTS § 31:4 (4th ed.1999). The destination is what both parties express in the ticket. *See Swaminathan v. Swiss Air Transp. Co.,* 962 F.2d 387 (5th Cir.1992).

The unambiguous terms of the contracts were the fare, flight numbers, dates and times of travel, and point of departure and destination. Santleben paid for domestic travel; Continental furnished it. They agreed to nothing further.

 Neither this court nor the Warsaw convention invented the rule that the contract for transport must express the terms of transport. It is a norm as old as the shipping business itself. The ticket does more than inform the parties of the passenger's name and flight details; it expresses the contract and is the most critical evidence of the parties' agreement. As a contract, the ticket designates the parties, the rate for the transport, and gives notice of the carrier's liabilities in the event of loss or injury. *See* John Miller, *Law of Freight Loss and Damage Claims* (1953). A carrier does not become connected to the passenger's other acts without direct formal notice to an agent of the carrier authorized to adjust the contract. In its contracts with Santleben and her daughter, Continental agreed only to the liability that would result from its negligence in domestic travel.

6. *Notice.*

 The convention applies to injuries on domestic travel only when the domestic carrier is reasonably aware of the international connections and expresses that knowledge in the contract. 49 U.S.C. § 40105, Article 1(3); *see Stratis v. Eastern Air Lines, Inc.,* 682 F.2d 406 (2d Cir. 1982). No matter the number of connecting flights, layovers, and side trips scheduled during the journey, a single operation exists if the passenger and the carrier agree that the carrier's leg of the trip is part of a body of international travel. The time and place of ticketing and the contemplated continuity of the travel help determine whether the parties view the travel as a unified operation. *See Petrire v. Spantax, S.A.,* 756 F.2d 263 (2d Cir.1985).

 Santleben arranged her Continental and international flights at different times and places through different agencies and payments. When it formed the contracts, Continental did not know or agree that it would be liable under the Warsaw convention as a domestic carrier in international travel. On June 1, the Omaha travel agency issued the invoice for Ammoniaci's Continental flights from Washington to San Antonio. Also on June

1, Ammoniaci's father bought Santleben's Continental tickets through the Washington travel agency. On June 24, SATO Travel issued the invoice for the international travel of both mother and daughter. Santleben did not directly pay for the tickets from Italy to Maryland; the American military did.

The time, place, and agency of issuance of the Continental tickets—the when, where, and who—were too disjointed to give Continental notice. No reasonable carrier could have discerned from its contract with Santleben that these domestic flights were a component of international travel under the convention.

Santleben claims that Continental did, in fact, know of her international flight plans. She points to an entry in Continental's computer record, stating that it was made at 4:11 p.m. on August 17. The entry reflects that Continental booked Santleben on a Continental flight from Washington, D.C., to Vicenza, Italy, as a customer service gesture. Santleben contends that this entry evinces the airline's knowledge of her international trip.

■ The specific computer entry was actually made at 9:04 p.m., after the women were injured on Flight 538. This after-the-fact knowledge is not notice. Knowledge of international travel must be expressed in the contracts or effectively communicated at the time of contracting to hold a carrier liable for injury under the convention. Notice is effective only if it is given in time to be incorporated into the original contract. Receiving a complimentary flight to Italy after being injured on a Houston–Washington flight for which the contract had been completed is not "notice" in any conceivable sense.

Whether a counter agent, baggage handler, or flight attendant knew of Santleben and Ammoniaci's travel plans before or after the accident, rumor is not notice.

Chit-chat does not give Continental notice that it is a part of international travel, nor does Santleben's telepathic broadcasting of her intent to fly to Italy after reaching Washington. No number of conversations in the course of the trip can alter the terms of travel agreed to at contract formation. Nor can the terms of the contract be amended by practice: Santleben cannot add trips to her original itinerary and expect the Warsaw convention to cover them. The only parts of the transaction that affect her case are the objective terms of the original contract. According to the ticket, Santleben contracted for domestic round-trip travel with Continental. Her unilateral knowledge of her trans-Atlantic trek does not make Continental liable under the Warsaw convention.

### 7. The Delta Flight.

Santleben asserts in her motion that the flight on the morning of August 18 from Houston to Washington arrived late, causing her and Ammoniaci to miss their originally scheduled Delta flight, booked through SATO. Delta flight 746, however, was not scheduled to leave until 3:10 p.m. on August 18. Mother and daughter went to the Continental counter and received free tickets to Rome, beginning with a 2:00 p.m. flight out of Washington, D.C. The Continental flight departed earlier than the "missed" Delta flight. The two were able to make Al Italia flight 1471 from Rome to Venice, another flight originally booked through SATO. Changing the international component of the trip from Delta to Continental does not make Continental liable under the Warsaw convention for injuries received on the totally separate domestic component of the trip. Santleben cannot impose Warsaw convention liability on Continental when she was injured before her international booking.

8. *Authority.*

To support her Warsaw convention claim, Santleben offers the magistrate judge's recommendations from a similar case from Oregon. *Coyle v. P.T. Garuda Indonesia*, 2001 U.S. Dist. Lexis 9483, (D.Or.2001). In that case, an American couple, the Badens, booked travel from the United States to Indonesia on Garuda Airlines through a Portland travel agency. After arriving in Indonesia, the Badens bought tickets for a separate Garuda flight from Jakarta to Medan. They were killed when the flight to Medan crashed. The court applied the Warsaw convention even though the crashed flight was entirely within Indonesia and had no connection to international travel.

The Oregon court incorrectly reasoned that the Badens' destination was Oregon because they had no intent to stay in Indonesia. It further postulated that the Badens might have mentioned their flight back to the United States to a Garuda employee, either while booking the Jakarta–Medan tickets or before boarding the fatal flight. Intent, or lack of it, manifested by the Badens after their initial ticket purchase in Portland is irrelevant. The only material factors are the objective terms in the travel contracts—the tickets. Garuda completed the Portland–Jakarta leg of the initial international contract; the later Jakarta–Medan contract was wholly domestic, not part of an international trip.

The court's counter-factual supposition that the Badens might have told a Garuda employee about their trip back to Portland is similarly immaterial. Garuda and Continental are mammoth operations. Garuda, Indonesia's national airline, and its subsidiaries operate over 100 aircraft, carry over 10 million passengers each year, and employ 25,000 people. Continental Airlines and Continental Express operate a fleet of nearly 600 aircraft. Continental is the fifth–largest airline in the United States, carrying 46 million passengers last year and employing 55,000 people. To hold either Garuda or Continental to Warsaw convention liability for supposed comments made in passing to a single employee is wholly unreasonable. Stray remarks do not alert an airline of its duties and liabilities. The convention requires notice, not clairvoyance.

The court also says that the Badens merely altered their initial contract midway through performance, retaining a destination of Portland even through the trip to Medan. For support, the court cites *Vergara v. Aeroflot*, 390 F.Supp. 1266 (D.Neb.1975). In that case, however, the couple's itinerary on an around-the-world trip was changed because a revolution in Afghanistan forced them to divert to Pakistan, where they were switched from a Kabul–Osaka flight to a Karachi–Osaka flight. The trip as originally planned and actually executed was wholly international; there were no "domestic legs." Nothing of the sort happened to the Badens, who willingly ventured on a domestic side trip during their Indonesian vacation. Neither was Santleben forced by circumstances into booking a Washington–San Antonio itinerary completely apart from her Italy–Washington itinerary. The case Santleben cites provides no support for her Warsaw convention claim.

9. *Conclusion*

The Continental tickets show that Washington was the destination of the domestic flight. The Continental tickets were purchased independently—in time, place, and payment—of the tickets issued by SATO Travel. The contracts with Continental show no knowledge that Continental's carriage would be associated with international flight. The Warsaw convention is not available to Santleben or her daughter,

and her motion for judgment as a matter of law will be denied.