Joyce E. COYLE, as Personal Representative of the Estate of Fritz G. Baden, deceased and as Personal Representative of the Estate of Djoeminah Baden, deceased, Plaintiff–Appellee,

v.

P.T. GARUDA INDONESIA, an Indonesian Corporation, dba Garuda Indonesia Airlines, Defendant–Appellant.

No. 01–35784.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 4, 2003.

Filed April 12, 2004.

Alan D. Reitzfeld (argued), James V. Marks, and Joanna L. Geraghty, Holland & Knight LLP, New York, New York, and Jonathan M. Hoffman and Douglas Pickett, Martin, Bischoff, Templeton, Langslet & Hoffman LLP, Portland Oregon, for the defendant-appellant.

Floyd A. Wisner (argued), Nolan Law Group, Chicago, Illinois, and Susan R. Swanson, Esq., Portland, Oregon, for the plaintiff-appellee.

Before: DIARMUID F. O'SCANNLAIN, FERDINAND F. FERNANDEZ, and RAYMOND C. FISHER, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must decide whether the federal courts have jurisdiction to hear this wrongful death claim arising out of a plane crash in Indonesia that resulted in the deaths of plaintiff's parents.

I

Fritz G. and Djoeminah Baden, residents of Lake Oswego, Oregon, decided to visit Indonesia in September 1997. To that end, the Badens contacted Astra World Express, Inc. ("Astra"), a Portland, Oregon travel agency, and booked the following itinerary:

| Date (1997) | Flight | Carrier |
| --- | --- | --- |
| September 6 | Portland to Seattle | Alaska/Horizon Airlines |
| September 7 | Seattle to Taipei | Eva Airways |
| September 8 | Taipei to Jakarta | Eva Airways |
| September 30 | Jakarta to Singapore | Garuda Indonesia Airlines |
| September 30 | Singapore to Taipei | Eva Airways |
| September 30 | Taipei to Seattle | Eva Airways |
| September 30 | Seattle to Portland | Alaska/Horizon Airlines |

On or about September 25, 1997, while in Indonesia, the Badens purchased two tickets in Jakarta for an open-ended round trip from Jakarta to Medan[1] aboard Garuda Indonesia Airlines ("Garuda")[2] Flight 152, leaving Jakarta at 11:30 a.m. on September 26. The Badens paid for the tickets in Indonesian Rupiah, and the tickets were clearly labeled "DOMESTIK." Flying through thick smoke generated by regional forest fires, the Airbus A300 B4 carrying the Badens dropped well below normal altitude on its approach into Medan and crashed into the side of a mountain. None of the 232 passengers and crew on board survived the crash, making it the worst air disaster in Indonesian history.[3]

---

**1.** Comprised of literally thousands of islands, Indonesia is perched upon the Pacific Ocean Basin's volcanic "Ring of Fire." Medan is the largest city on the island of Sumatra, which is situated to the northwest of the Indonesian capital city Jakarta on the island of Java.

**2.** Garuda is wholly owned by the Indonesian Government and therefore an "instrumentality of a foreign state" for purposes of the Foreign Sovereign Immunities Act. 28 U.S.C. § 1603(a)-(b) (2003).

**3.** *See* Paul Proctor, *CFIT Eyed in Garuda Crash*, Aviation Week and Space Technology,

On September 22, 1999, Joyce Coyle, one of the Badens' three children, filed a lawsuit against Garuda in the United States District Court for the District of Oregon, alleging both negligent and intentional wrongful death claims under the Convention for the Unification of Certain Rules Relating to International Transportation by Air—more commonly known as the Warsaw Convention. 49 U.S.C. § 40105 note (2003).[4] Anticipating that Garuda would invoke Indonesia's sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604 (2003), and thereby attempt to deprive the federal courts of subject matter jurisdiction over her action,[5] Coyle argued that two exceptions to FSIA's grant of sovereign immunity, 28 U.S.C. §§ 1605(a)(1) & 1605(a)(2), applied to allow the federal courts to entertain her suit. The former FSIA subsection denies immunity to sovereigns that have explicitly or implicitly waived it, while the latter denies immunity to foreign sovereigns in actions"based upon a commercial activity carried on in the United States by the foreign state ... or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." *Id.* Coyle argued first that Garuda's foreign air carrier operating permit[6] in place at the time of the accident included an express waiver of its sovereign immunity for actions arising under an international treaty, and second that Garuda was subject to suit in federal court based upon its sale of tickets in the United States for the Coyle's international transportation, of which Flight 152 was allegedly a part.

Predictably, Garuda moved to dismiss Coyle's lawsuit pursuant to Fed.R.Civ.P. 12(b)(1)-(3) or, alternatively, for summary judgment under Fed.R.Civ.P. 56. The airline contended that: (1) the district court

---

Oct. 6, 1997, at 40.

4. Article 17 of the Warsaw Convention provides that: "The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking."

5. "The Foreign Sovereign Immunities Act provides the exclusive source of subject matter jurisdiction over suits involving foreign states and their instrumentalities." *Gates v. Victor Fine Foods*, 54 F.3d 1457, 1459 (9th Cir.1995). "Under the Act, foreign states are presumed to be immune from the jurisdiction of United States courts unless one of the Act's exceptions to immunity applies." *Id.; see also* 28 U.S.C. § 1604 (2003).

6. Pursuant to section 402(a) of the Federal Aviation Act of 1958 ("F.A.A."), Pub.L. No. 85-726, codified prior to amendment at 49 U.S.C. § 1372, "No foreign air carrier shall engage in foreign air transportation unless

there is in force a permit issued by the[Civil Aeronautics] Board authorizing such carrier so to engage." With passage of the Civil Aeronautics Board Sunset Act of 1984, Pub.L. No. 95-504, the foreign air carrier permit issuing functions previously performed by the Board were transferred to the Department of Transportation. *See* F.A.A. § 1601. Garuda applied to the Department of Transportation for issuance of a foreign air carrier permit under § 402(a) on July 3, 1986, *see* 51 Fed. Reg. 25780 (July 16, 1986), and received its permit on August 15, 1988. *See* Department of Transportation Order No. 88-8-53 (August 15, 1988). Presently codified at 49 U.S.C. § 41301, the foreign air carrier permitting provision now reads: "A foreign air carrier may provide foreign air transportation only if the foreign air carrier holds a permit issued under this chapter authorizing the foreign air transportation."

Had the accident here at issue occurred nine months later, this contention would have been moot. Garuda is not currently authorized to operate any flights to, from, or within the United States, and has not been authorized to so do since July, 1998.

lacked subject matter jurisdiction because Flight 152 was "purely Indonesian domestic transportation," and therefore not within the ambit of the Warsaw Convention; (2) the district court lacked personal jurisdiction over Garuda; (3) Oregon was an improper venue; and (4) Oregon was an inconvenient forum.

On April 30, 2001, Magistrate Judge John Jelderks issued his "Findings and Recommendation" in which he concluded that Garuda had waived its entitlement to Indonesia's sovereign immunity. This conclusion was based upon his assessment that the Badens' ill-fated Jakarta–Medan flight, while itself entirely domestic, was nevertheless "one leg of an international journey" and therefore subject to the terms of the Warsaw Convention. Accordingly, he concluded that Coyle's lawsuit fell within the exception provided in 28 U.S.C. § 1605(a)(1), and thus could not be barred by an assertion of sovereign immunity by Garuda. In addition, he concluded that personal jurisdiction over Garuda was proper and that venue lay in federal district court in Oregon.

The district court adopted the magistrate judge's report on June 28, 2001, and scheduled the case for trial. Garuda filed this interlocutory appeal, challenging the court's determination that the Warsaw Convention applied to the flight along with its determinations regarding personal jurisdiction, venue, and forum non conveniens. Prior to oral argument, we indicated in an unpublished order that the district court's decisions with respect to personal jurisdiction, venue, and forum non conveniens were non-appealable at this stage. Therefore, only the issue of Garuda's immunity from suit—and thus, of our subject

matter jurisdiction over Coyle's action—remains for decision here.

## II

■■■ We first consider whether Indonesia has waived Garuda's entitlement to sovereign immunity "either explicitly or by implication" under 28 U.S.C. § 1605(a)(1).[7]

### A

■■■ Coyle contends that Garuda's possession of a U.S. Department of Transportation (USDOT) foreign air carrier operating permit at the time of the accident constituted a waiver of foreign sovereign immunity. In relevant part, that permit provided:

(3) The holder agrees that operations under this permit constitute a waiver of sovereign immunity for the purposes of 28 U.S.C. § 1605(a), but only with respect to or proceedings instituted against it in any Court or Tribunal in the United States that are:

(a) Based upon its operations in international air transportation that, according to the contract of carriage, include a point in the United States as a point of origin, point of destination, or agreed stopping place, or for which the contract of carriage was purchased in the United States; or

(b) Based upon any claim under any international agreement or treaty cognizable in any Court or other Tribunal of the United States.

In this condition, the term "international transportation" means "international transportation as defined by the Warsaw Convention," except that all States shall

---

**7.** Whether the district court had subject matter jurisdiction over this case is a question of law that this court reviews de novo. *See Phaneuf v. Republic of Indonesia,* 106 F.3d 302, 304–305 (9th Cir.1997). "[F]actual findings on jurisdictional issues are reviewed for clear error." *Adler v. Fed. Republic of Nigeria,* 107 F.3d 720, 723 (9th Cir.1997).

be considered to be High Contracting Parties for the purpose of this definition. Garuda responds that its permit's waiver does not apply to the present case. Specifically, the airline argues that the first paragraph of Section 3 of the permit—which states that "[t]he holder agrees that operations under this permit constitute a waiver of sovereign immunity" for certain enumerated claims—affirmatively excludes Flight 152 because, as a trip between two foreign cities wholly within the borders of Indonesia, it did not constitute an "operation[ ] under this permit." We respectfully disagree.

The enumerated claims for which acceptance of its permit constituted a waiver of sovereign immunity are defined as those "(a) Based on its operations in international air transportation that, according to the contract of carriage, include a point in the United States ..." and those "(b) Based upon a claim under any international agreement." If, as Garuda contends, its sovereign immunity could be waived only for flights "between a place in the United States and a place outside the United States," the first of the above cited clauses would be rendered surplusage, and the second of the above cited clauses would spur an irreconcilable interclausal contradiction: As will soon become clear, purely domestic flights within a foreign nation can—at least in certain circumstances-fall within the coverage of the Warsaw Convention. *See* Warsaw Convention Article 1(3).

The lone case Garuda cites in support of its reading of the permit, *Barkanic v. General Administration of Civil Aviation,* 822 F.2d 11 (2d Cir.1987), does little to advance its argument. Faced with a wrongful death claim arising from the crash of a domestic flight in China, the Second Circuit in *Barkanic* reversed the district court's finding that the defendant was entitled to immunity. Before reaching its ulti-mate conclusion—that the defendant's sale of tickets to the plaintiffs in the United States constituted a "commercial activity" waiver under the FSIA—the Second Circuit noted that the defendant's permit waiver "did not cover the entirely domestic flight between the terminal points Beijing and Nanjing in China." *Barkanic,* 822 F.2d at 12.

Garuda seizes upon this language, but ignores the terms of the permit at issue in *Barkanic:* "Attached to the ... permit was a waiver of any defense of sovereign immunity from suit 'based upon any claim arising out of operations by the holder under this permit.' " *Id.* Thus, while the *Barkanic* waiver was limited to "claim[s] *arising out of operations* ... under this permit," Garuda's waiver is far broader and reaches suits "based on [the holder's] operations in international air transportation" and those "based upon a claim under any international agreement or treaty." Quite in contrast to the permit at issue in *Barkanic,* then, Garuda's waiver cannot plausibly be limited only to those claims "arising from" operations under its permit. Instead, Garuda is subject to suits arising out of the circumstances enumerated in sections 3(a) and 3(b) of its permit.

**B**

In order to determine whether Garuda's immunity waiver applies to the present lawsuit, we now turn to whether operation of Flight 152 falls within the ambit of the Warsaw Convention. Ratified by the United States in 1934—and therefore an international agreement capable of grounding claims cognizable in the federal courts within the meaning of Garuda's permit waiver—the Warsaw Convention established uniform rules for claims arising out of international air travel. Article 1(1) of the Convention states that it "shall apply to all international transportation of

persons, baggage, or goods performed by an aircraft for hire." Article 1(2) of the Convention then defines "international transportation" as:

> any transportation in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in the transportation or a transshipment, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting Party, if there is an agreed stopping place within a territory subject to the sovereignty, suzerainty, mandate or authority of another power, even though that power is not a party to this convention.

Warsaw Convention Article 1(2).

■ Garuda first argues that Flight 152—as a purely domestic flight within the sovereign territory of Indonesia—cannot constitute "international transportation" as defined by Article 1(2) of the Convention, and therefore that its permit's immunity waiver is inapplicable to Coyle's lawsuit because her action does not arise under an international treaty or agreement. This sweeping argument, however, is—as previously suggested—foreclosed by Article 1(3), which provides:

> Transportation to be performed by several successive air carriers shall be deemed, for the purposes of this convention, to be one undivided transportation, *if it has been regarded by the parties as a single operation,* whether it has been agreed upon under the form of a single contract or of a series of contracts, and it *shall not lose its international character merely because one contract or a series of contracts is to be performed entirely within a territory* subject to the sovereignty, suzerainty, mandate, or authority of the same High Contracting Party.

Warsaw Convention Article 1(3) (emphasis added). Such language unambiguously indicates that, *at least in certain circumstances,* purely domestic air travel can be covered by the Warsaw Convention's definition of international transportation.

At the same time, in order for Garuda's permit's sovereign immunity waiver to apply in this action, Coyle's claim must be "cognizable in a[ ] Court or other Tribunal of the United States." Article 28 of the Warsaw Convention strictly limits where claims under the Convention may be brought:

> An action for damages must be brought, at the option of the plaintiff, in the territory of one of the High Contracting Parties, either before the court of the domicile of the carrier or of his principal place of business, or where he has a place of business through which the contract has been made, or before the court at the place of destination.

Warsaw Convention Article 28(1). Thus, unless one of these enumerated places is within the United States, no American court can take cognizance of a suit predicated on the Warsaw Convention. *See, e.g., Kapar v. Kuwait Airways Corp.,* 845 F.2d 1100, 1104 (D.C.Cir.1988) ("Article 28(1)'operates as an absolute bar to federal jurisdiction in cases falling outside its terms.' ") (quoting *Gayda v. LOT Polish Airlines,* 702 F.2d 424, 425 (2d Cir.1983)). Because the United States is neither Garuda's domicile nor its principal place of business, and because the Badens purchased their tickets for Flight 152 while in Jakarta, the only way that an American court can take cognizance of Coyle's action is if the Badens' "place of destination" was in the United States.

Yet, whether one focuses on the conditions necessary to satisfy the definition of international transportation set forth in Articles 1(2)-(3)—that is, whether the flights at issue were "successive" and re-

garded by the parties as part of a "single operation"—or upon the "place of destination" test set forth in Article 28(1), our inquiry into satisfaction of the Warsaw Convention for purposes of Garuda's immunity waiver is the same. In *Sopcak v. Northern Mountain Helicopter Service*, 52 F.3d 817 (9th Cir.1995), we framed the "place of destination" test by explicit reference to Article 1(3), joining the Second and Fifth Circuits in holding that "the intention of the parties ... determines the final destination." *Id.* at 819; *see also Swaminathan v. Swiss Air Transp. Co.*, 962 F.2d 387, 389 (5th Cir.1992); *Petrire v. Spantax, S.A.*, 756 F.2d 263, 265 (2d Cir.1985).

■ Crucially, we also explained how to discern those intentions—by reference to their "express[ion] in the contract of transportation, i.e., the ticket or other instrument"—and held that "[s]uch contracts should be interpreted according to the objective, rather than the subjective, intent of the parties." *Sopcak*, 52 F.3d at 819; *cf. Compania Mexicana De Aviacion, S.A. v. United States Dist. Ct.*, 859 F.2d 1354, 1359(9th Cir.1988) ("The Convention defines international transport according to the contract made by the parties. All the tickets involved in this case were for domestic Mexican flights, not for international air transport. Warsaw Convention, Article 1(2). Moreover, Article 28[sets forth jurisdictional restrictions]. The place of destination is the final destination according to the contract of carriage.... The contracts of carriage for the decedents involved in this case were all made in Mexico, for destinations within Mexico...."). Finally, we held that although "a passenger's intent is accorded considerable weight in ascertaining the final destination, 'when a contract is unambiguous, the instrument alone is taken to express the intent of the parties.' " *Id.* (quoting *Swaminathan*, 962 F.2d at 389). Our case law—along with that of our sister circuits and a wide array of lower courts—thus directs us to focus on the objective manifestations of the parties' intent expressed by the tickets for commercial passenger carriage [8] in order to determine both a traveler's "destination" and whether his or her transportation constituted a "single operation" of international travel for Warsaw Convention purposes.[9]

8. *Sopcak's* reference to the possibility of focusing our interpretation on an "other instrument" *instead of* "the ticket," *see* 52 F.3d at 819 ("the contract of transportation, i.e., the ticket *or* other instrument") (emphasis added), appears simply to refer to the unique circumstances accompanying the kind of privately chartered · (non-commercial) group flight at issue in that case. Charter carriers frequently abstain from delivering tickets to the individual passengers who ultimately fly aboard a private group flight; instead, the contract for transportation on such flights is often made by an employer or other entity, who in turn (through its own agent) determines individual passenger entitlement to board the chartered aircraft. Indeed, this common practice has raised at least one "issue of fundamental importance to an increasing number of international air travelers who board charter flights," *Miceli v. MGM Grand Air, Inc.*, 51 Cal.App.4th 702, 707, 59 Cal. Rptr.2d 311 (Cal.Ct.App.1996), *cert. denied,* 522 U.S. 820, 118 S.Ct. 75, 139 L.Ed.2d 34 (1997), namely whether a charter carrier who has not issued individual tickets to its passengers is entitled to invoke the liability limitations provided by the Warsaw Convention.

In such circumstances—where there is no individual passenger ticket for a court to examine at all—attention to an"other instrument" in determining the jurisdiction of this court for Warsaw Convention purposes is appropriate. In fact, it is quite necessary. But where, as here, there are passenger tickets in evidence, the pertinent caselaw directs that those are where our analysis must focus.

9. *See also Haldimann v. Delta Airlines, Inc.*, 168 F.3d 1324, 1325 (D.C.Cir.1999) (explaining that "in the rare case where there has been evidence of a traveler's subjective intent, and it contradicted the court's inference from specific documentary indicia, courts have held that the indicia trump subjective evi-

This focus on the tickets for passenger air transportation does not, of course, necessarily mean that a court may not call upon extrinsic evidence in order to make sense of the objective indicia presented by those tickets—for instance, in deciphering an industry code affixed to a particular flight coupon (by referring to trade usage), *see, e.g., Aviateca,* 29 F.Supp.2d at 1340; translating a foreign phrase or expression (by referring to a dictionary), *cf. In re*

*Envirodyne Indus.,* 29 F.3d 301, 305 (7th Cir.1994) ("[D]ictionaries, treatises, articles, and other published materials created by strangers to [a contractual] dispute, like evidence of trade usage, which is also admissible because it is also evidence created by strangers rather than by a party trying to slip out of a contractual bind, do not present a ... danger of manufactured doubts and are therefore entirely appro-

dence," and ultimately basing its decision on the fact that the traveler's tickets "were issued and paid for on the same date, March 7, 1996[and] share the same record number"); *Swaminathan,* 962 F.2d at 389 ("When interpreting the meaning of a contract it is the objective, and not the subjective intent of the parties which controls. When a contract is unambiguous, the instrument alone is taken to express the intent of the parties.... The contract before us is unambiguous as to the destination. We look at the ticket and retain no doubt that Dakar, Senegal is the final destination."); *Compania Mexicana,* 859 F.2d at 1359 (defining the parties' contract by reference to their tickets for air transportation); *Petrire,* 756 F.2d at 265 & 266(explaining that the passenger's " 'destination' is to be determined from the contract for transportation" and holding that the "the objective facts of the ticketing"—namely, that the passenger's flight coupons were contained in "two ticket booklets[which] were issued sequentially at the same time and the same place for round-trip travel to be interrupted by no more than a five-day stopover"—revealed the existence of a single contract for an undivided transportation); *Osborne v. British Airways PLC, Corp.,* 198 F.Supp.2d 901, 904 (S.D.Tex.2002) ("In the transportation of passengers, the relevant contract for purposes of the Convention is the passenger ticket issued by the airline."); *Santleben v. Cont'l Airlines,* 178 F.Supp.2d 752, 755 (S.D.Tex.2001) ("The destination is what both parties express in the ticket."); *Carey v. United Airlines, Inc.,* 77 F.Supp.2d 1165, 1169 (D.Or.2000) ("The application of the Warsaw Convention to any damages claim is determined by Article 1 and the transportation contract which, in the transportation of passengers, is the passenger ticket."); *Singh v. Tarom Romanian Air Transp.,* 88 F.Supp.2d 62, 65 (E.D.N.Y.2000) ("[T]he 'destination' of a round trip international airline ticket within

the meaning of Article 28(1) is the starting point of the journey.... [T]he unexpressed intentions of the passenger are not relevant if the instrument evidencing the contract is unambiguous. ... Here, plaintiffs' tickets clearly indicate that Delhi was the starting point of plaintiffs' travel. Thus, notwithstanding plaintiffs' claim [about their unexpressed intentions], Article 28(1)'s destination clause does not give a basis for this court to exercise jurisdiction under the Convention."); *In re Air Crash Disaster of Aviateca Flight 901,* 29 F.Supp.2d 1333, 1341 (S.D.Fla.1997) ("[T]he determination of whether the parties regarded the transportation as a single operation requires an inquiry into the parties' intentions when entering into the contract of carriage. In determining the parties' intentions, the Court must look to the terms of the contract for transportation, in this case, the airline tickets. Where the terms of the contract are unambiguous, the court need not and should not look beyond [them] in determining the parties' objective intentions.") (citations omitted); *Rabinowitz v. Scandinavian Airlines,* 741 F.Supp. 441, 443 (S.D.N.Y.1990) ("The application of the Warsaw Convention to any damages claim is determined by Article 1 and the transportation contract which, in the transportation of passengers, is the passenger ticket."); *Lee v. China Airlines, Ltd.,* 669 F.Supp. 979, 981 (C.D.Cal.1987) ("[T]he Convention mandates that 'destination' be determined by reference to a passenger's ticket...."); *Stanford v. Kuwait Airways Corp.,* 648 F.Supp. 657, 661 (S.D.N.Y.1986) ("The place of destination under Article 28(1) is the ultimate destination of the transportation stated on the passenger ticket."); Andreas F. Lowenfeld & Allan I. Mendelsohn, *The United State and the Warsaw Convention,* 80 Harv. L.Rev. 497, 500 (1967) ("All determinations regarding the applicability of the Convention are based on the ticket.").

priate for use in contract cases as interpretive aids."); or observing that the record numbers revealed on a particular flight coupon do not correspond to those on its asserted companions (by, of course, referring to those asserted companions), *see, e.g., Haldimann,* 168 F.3d at 1325.

We also acknowledge that, *to a limited degree,* certain objective extrinsic evidence may connect flights together as, or rule out the possibility that certain flights were, part of an undivided transportation even when the flight coupons do not *themselves* evince such a connection (or its absence). In particular, we think that the Second Circuit in *Petrire* appropriately looked to "the objective facts of the ticketing"—of note here, the facts that the passenger's flight coupons "were issued sequentially at the same time and the same place for round-trip travel to be interrupted by no more than a five-day stopover"—in determining that the parties had a single contract for undivided international transportation. *Petrire,* 756 F.2d at 265; *see also McLoughlin v. Commercial Airways (Pty) Ltd.,* 602 F.Supp. 29, 33 (E.D.N.Y.1985) ("[W]here, as here, the parties arrange, and pay in full for an international trip at the outset, each leg of the journey (even though some legs may be wholly domestic, covered by a separate ticket and carried on a separate airline) is within the Convention."); *cf. In re Air Crash Disaster at Warsaw, Poland, on March 14, 1980,* 748 F.2d 94, 96–97 (2d Cir.1984) ("As a result of the separate handling of the ticket reservations, payment, issuance, and delivery for the domestic flights and the LOT [Polish Airlines] flight, not only would the passengers not be likely to have considered the flights as a 'single operation,' ... but the carriers could not have considered that they were 'successive.' ") (citing 1 Stuart Speiser & Charles F. Krauss, *Aviation Tort Law* § 11.10 (1978)).

■ We agree that such objective evidence of the circumstances of the ticketing is appropriately considered by courts evaluating the connectedness of individual flight segments for Warsaw Convention purposes. Absent an objective showing of actual knowledge by the air carrier of the passengers' overall itinerary—that is, an admission that the airline (or its agent) actually understood the disputed flight to have been part of the decedent's international journey—however, other kinds of extrinsic evidence are not appropriately introduced to contradict what the tickets (and the objective facts of the ticketing) unambiguously reveal. *See, e.g., Gasca v. Empresa De Transporte Aero Del Peru,* 992 F.Supp. 1377, 1381(S.D.Fla.1998) (holding that a trip from Santiago, Chile to Lima, Peru was destined for Miami, Florida, and thus that Warsaw Convention venue in the United States was proper, because "AeroPeru's agent in Santiago who issued the ticket for the flight ... attest[ed] to the knowledge of all parties that [the decedent] was on a business trip that was to ultimately take him back to Miami."); *Vergara v. Aeroflot "Soviet Airlines",* 390 F.Supp. 1266, 1269 (D.Neb. 1975) ("Significantly, the Tashkent to Karachi trip was arranged by the defendant in an effort to permit the plaintiffs to continue their scheduled trip. Aeroflot was aware of the ultimate destination, as well as the intermediate stops.").

### C

■ Applying this firmly-settled methodology to the present case, we must conclude that the Badens' tickets for Garuda Flight 152 do not represent a contract for international transportation within the meaning of the Warsaw Convention. First, the tickets designate the origin and destination of the trip as round trip from Jakarta to Medan with an open return date. They do not refer to any other

tickets, or to a larger flight itinerary. They do not include a reference number, symbol, or any other manifestation denoting a connection to further travel.

Coyle argues that this lack of connection is unimportant: "Naturally this ticket only shows travel between Jakarta and Medan. There is no reason it would show the Badens' entire international trip." But this is not necessarily so. If the flight were intended to be in conjunction with or "successive" to the Badens' international trip, the ticket very well might reference the Badens' international itinerary or another scheduled flight by reference number, code, or in some other significant way. *See, e.g., Haldimann,* 168 F.3d at 1325 (D.C.Cir.1999) (all tickets, though with different airlines, shared the same record number); *In re Alleged Food Poisoning Incident,* 770 F.2d 3, 6–7 (2d Cir.1985) (all flights ticketed in two booklets issued together and known as a "conjunction ticket"); *Vergara,* 390 F.Supp. at 1267–68 (D.Neb.1975) (tickets for two passengers had been issued in twelve booklets containing four flight coupons each; every one of the 48 flight coupons showed "[t]he numbers of each of the other five booklets issued to each plaintiff; the fare for the entire journey; the number of the credit account by which payment was made; [that] Omaha was designated ... the place of origin and the place of destination; plaintiffs' entire itinerary; ... the agency issuing the coupon; ... and, information sufficient to identify at least two segments of the journey, including fare basis, air carrier, flight number, date and time of departure and reservation status").

Second, the tickets are clearly labeled "DOMESTIK." [10] Coyle argues that we should not give the term "DOMESTIK" any significance, pointing to *Aviateca's* suggestion that certain notations are to be discounted when "there is no reason to

believe that the passengers had any idea what the significance of the ... designations was or whether those designations conflicted with or were representative of their intentions when their tickets were issued." *Aviateca,* 29 F.Supp.2d at 1342–43. The notations on the tickets at issue in *Aviateca,* however, were industry codes ("SITI" or "SOTO") used to signify whether a ticket was sold and issued inside the country of commencement of international travel. *Id.* at 1342. The term "DOMESTIK" that appears on the Badens' tickets is not nearly as arcane, would readily have been understood by the Badens, and constitutes strong evidence that, as objectively represented in their tickets, the parties understood Flight 152 to be a domestic trip.

The district court also put little stock in the tickets' "DOMESTIK" marking: "The fact that—from the airline's perspective—the flight was domestic is of little significance." We are not so easily persuaded. Indeed, we reject the contention that Garuda's perspective of the flight is not significant. Article 1(3) requires us to consider the intent of *both* parties to the contract. *See* Warsaw Convention Article 1(3) ("... if it has been regarded by the *parties* as a single operation....") (emphasis added); *see also Klos v. Polskie Linie Lotnicze,* 133 F.3d 164, 168 (2d Cir.1997); *Swaminathan,* 962 F.2d at 389; *Aviateca,* 29 F.Supp.2d at 1343; *Gasca,* 992 F.Supp. at 1381. We think the marking of the Badens' tickets as "DOMESTIK"—coupled with the lack of any other kind of notation connecting those tickets to international travel—illustrates that the parties regarded Flight 152 as a domestic one unconnected to the Badens' international travel.

---

10. Neither party disputes that the term "DO-    MESTIK" means "domestic."

Finally, we note that the Badens' tickets for Flight 152 illustrate that they were purchased two months after the purchase of their international itinerary, obtained not through Astra Travel in Oregon but in Jakarta, issued in Indonesia, and paid for in Indonesian Rupiah. These facts further lead us to conclude that the intent of the parties—as objectively and unambiguously represented by the tickets for the Badens' round trip air transportation between Jakarta and Medan—is that their voyage on Flight 152 was not connected or successive to the Badens' earlier scheduled international travel. The "final destination" of their Jakarta Medan round trip was Jakarta, Indonesia.

Coyle argues that Garuda must prove that the Badens intended to abandon their home in Oregon and remain in Indonesia in order to prove that their final destination was not Portland, and jurisdiction over the present action therefore improper. We agree that what matters is the final destination of the passengers and not the plane. *See, e.g., Compania Mexicana,* 859 F.2d at 1359. And we also agree that there can only be one "destination" for Warsaw Convention purposes for each passenger and that intermediate stops on trips are to be construed as "agreed stopping places" that do not disturb that final destination. *See Food Poisoning Incident,* 770 F.2d at 6–7. But these arguments only beg the question by improperly assuming that the Badens' flight to Medan on Garuda must have been part of their larger international journey. We do not doubt the Badens' desire to return to their Oregon home at the end of their vacation. We understand that the "final destination" of their international trip was Portland. Yet the crux of this litigation is whether Flight 152 *was a part of* that larger international trip for purposes of the Warsaw Convention—whether it was a component of "one undivided transportation . . . regarded by the parties

as a single operation," Warsaw Convention Article 1(3), with Portland, Oregon as its destination, or just a late-added, purely domestic side trip apart from their international itinerary with its own final destination. The Badens' tickets for Flight 152 are powerful, unambiguous evidence of the latter.

### D

Coyle does not offer any reason for not simply applying this analysis to determine whether the Badens' destination on Flight 152 was the same as their destination during the truly international aspect of their trip. To the contrary, she expresses concern that this court might "focus solely on the Badens' ticket for only the Jakarta to Medan segment of their international transportation, to the exclusion of all other evidence of the parties' intent." Under *Sopcak,* however, the tickets (and the objective facts of their issuance) are *exactly* where we must look to find the parties' objective intent, turning our gaze elsewhere in search of the parties' subjective intent only if we find the objective manifestations of the parties' intent ambiguous. *Sopcak,* 52 F.3d at 819; *see also Haldimann,* 168 F.3d at 1325; *Swaminathan,* 962 F.2d at 389; *Compania Mexicana,* 859 F.2d at 1359; *Petrire,* 756 F.2d at 265–66; *Osborne,* 198 F.Supp.2d at 904; *Santleben,* 178 F.Supp.2d at 755; *Aviateca,* 29 F.Supp.2d at 1341; *Carey,* 77 F.Supp.2d at 1169; *Singh,* 88 F.Supp.2d at 65; *Rabinowitz,* 741 F.Supp. at 443; *Lee,* 669 F.Supp. at 981; *Stanford,* 648 F.Supp. at 661. Having considered the wide array of objective indicia presented by the Badens' tickets, we see little reason to venture further.

One can infer from the district court's decision, however, that it felt the method sanctioned by this court in *Sopcak* was inapplicable to the facts of this case. Per-

haps what made the application of this rule seem problematic to the trial court was not that there is *no* "ticket or other instrument" in this case for it to examine for objective intent, but rather that this case provides *both* a "ticket" (the contract for passage on the ill-fated flight) *and* a kind of "other instrument" (a printout listing the itinerary booked by the Badens through their Portland travel agent). However, we do not believe the existence of a separate itinerary poses any challenge to the method we have affirmed here. As we already have explained, *Sopcak's* disjunctive phrasing merely recognized the unique circumstances presented by charter aircraft, which often take flight without first having issued individual passenger tickets to all aboard. *See supra* n. 8. Where, as here, the subject of our inquiry is commercial air transportation involving issued passenger tickets, those documents are where we must turn in order to determine the parties' final destination and whether specific legs of their trip together constituted a "single operation."

At bottom, the Badens' tickets for Flight 152 unambiguously represent it as a domestic side trip within Indonesia, separate from their international trip, and with its own final destination. To the extent that the printed itinerary sheds light on the subject of our inquiry, far from exempting this case from the methodology we have expounded here, the facts that the itinerary does not list, mention, or refer to Flight 152 or to the Medan destination (and that it does not list a similar flight that Flight 152 might be construed as replacing) only confirms our conclusion that the parties' tickets unambiguously represent that their agreement was for purely domestic Indonesian travel.

## E

In the absence of any objective evidence indicating that either party considered Flight 152 part of the Badens' internation-al transportation, the district court relied on two conjectural assignments of subjective awareness to Garuda: (1) an agency-like theory arguing that the airline was aware (through the activities of Astra in Portland) that the Badens intended to return to Oregon; and (2) speculation that Garuda was aware (through hypothetical contacts between the Badens and Garuda's employees in Jakarta) that the Badens were Americans.

First, we reject the "agency theory" imputing knowledge from Astra to Garuda. The cases relied upon for the proposition that a travel agent's knowledge can be imputed to the principal airline are distinguishable. In *Aviateca,* the court imputed knowledge of the passenger's ultimate destination to the carrier only after it found that the carrier's agent had been responsible for booking *all* legs of the passenger's journey at the same time, including the ill-fated flight. *Aviateca,* 29 F.Supp.2d at 1343–44(noting "the overwhelming majority of cases in which the courts have determined that parties regarded travel as a single operation where tickets were issued at the same time by the same agent for multiple legs of journeys"); *id.* at 1345 ("[P]assengers in the present cases all purchased both sets of their tickets at the same time from the same travel agent, and the travel agent and the passengers all knew at the time the tickets were purchased that the passengers intended to return to Oslo after completing their study in Nicaragua.").

In *Gasca,* the court emphasized that "AeroPeru's agent in Santiago who issued the ticket for the flight[ ] attest[ed] to the knowledge of all parties that [the plaintiff's predecessor] was on a business trip that was to ultimately take him back to Miami." *Gasca,* 992 F.Supp. at 1381. And in *Lam v. Aeroflot Russian International Airlines,* 999 F.Supp. 728(S.D.N.Y.1998), the

court not only began from the proposition that the ticket at issue was ambiguous, and therefore that it was appropriate "to turn to other indications of the intent or understanding of the respective parties," but emphasized testimony by the travel agent who acted as an intermediary between the passenger and the airline's representatives that attested to his awareness of the flight's status as part of an undivided international journey. *Id.* at 731 & 733.

In contrast, it is undisputed here that Astra World Express, Garuda's agent in Portland, did not book the Badens on Flight 152. Instead, Astra booked only the *other* flights upon which the Badens were scheduled to fly, and the Badens booked their own passage on Flight 152 nearly two months later. Coyle has presented no evidence that either Garuda or Astra Travel actually understood the Badens' side trip to be part of a larger international itinerary. At bottom, in the absence of compelling objective evidence indicating the existence of actual knowledge on the part of Garuda's or Astra Travel's agents—that is, an admission—such a constructive assignment of hypothetical awareness cannot undermine the conclusions that flow from the Badens' unambiguous tickets.

Second, we decline to adopt the district court's assignment of knowledge based on its speculation regarding the Badens' putative contacts with Garuda representatives—in particular, its suggestions (1) that the Badens would have been required to show identification when buying tickets or boarding Flight 152, thereby revealing them to be American citizens and residents; and (2) that because the side trip was planned so near to the Badens' scheduled return to the U.S., they would have mentioned their pending international flight to a Garuda representative in order to confirm that they would return from

Medan to Jakarta in time to make their international flights.

We think that *Santleben's* critique of this section of the district court opinion gets things precisely right:

> Garuda, Indonesia's national airline, and its subsidiaries operate over 100 aircraft, carry over 10 million passengers each year, and employ 25,000 people. . . . To hold [the airline] to Warsaw convention liability for supposed comments made in passing to a single employee is wholly unreasonable. Stray remarks do not alert an airline of its duties and liabilities. The convention requires notice, not clairvoyance.

*Santleben,* 178 F.Supp.2d at 757. As with its theory of agency, the district court's speculation about these putative contacts cannot constitute actual evidence of the parties' intent, nor possibly operate to undermine our analysis of the objective indicia of intent presented clearly by the Badens' tickets for Flight 152.

In the end, the district court's admittedly thoughtful suggestions do nothing to dissuade us from concluding that the objective evidence in this case unambiguously signifies the parties' mutual intent: that the Badens' flight to Medan was a sidetrip, unconnected to their larger international itinerary, and beyond the waiver made in Garuda's USDOT permit.

## III

█ We now turn briefly to Coyle's second argument: that her claim falls within the "commercial activity" exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(2), such that, even if Flight 152 was not a successive leg of the Badens' "international travel" for purposes of the Warsaw Convention (and Garuda's permit waiver thus inapplicable), jurisdiction would still be proper. The FSIA's "commercial activities" exception denies

immunity to foreign sovereigns and their instrumentalities in actions "based upon a commercial activity carried on in the United States by the foreign state ... or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere [when such] act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

Coyle argues that the required commercial nexus in this case is established by "Garuda's commercial activity in the U.S. of selling the tickets to the Badens for their entire international transportation, of which the accident later became a part." We have already held, however, that Flight 152 was not part of the Badens' international transportation—that, instead, it was a domestic side trip purchased and undertaken separately. Accordingly, the Badens' purchase of the international travel package delineated on their original itinerary cannot create the requisite nexus. And because the Badens bought their tickets for the Medan flight in Indonesia, not the U.S., such commercial activity also fails to create the requisite nexus. Accordingly, we conclude that the "commercial activity" exception to the FSIA fails to terminate Garuda's sovereign immunity.

## IV

For the foregoing reasons, we are compelled to conclude that the federal courts lack jurisdiction over Ms. Coyle's action against Garuda. The district court's decision is hereby REVERSED, and this case REMANDED with instructions to dismiss for want of subject matter jurisdiction.